[S. F. Nos. 389 and 527.   In Bank.—September 13, 1897.]

# CITY OF OAKLAND, Respondent, v. OAKLAND WATER FRONT COMPANY, Appellant.

WATERFRONT OF OAKLAND—CONSTRUCTION OF STATE GRANT—"SHIP CHAN-
NEL"—"SOUTHERLY LINE OF ESTUARY"—LINE OF LOW TIDE—BOUNDARY
OF TOWN.—The grant by the state to the town of Oakland of all lands
upon its waterfront, lying within the corporate limits, as fixed by
the act of May 4, 1852, "between high tide and ship channel," is to be
construed most favorably to the state, and the boundary of the town
by "the southerly line of the San Antonio creek, or estuary," is to
be construed as being the southerly line of low tide of that estu-
ary, and the boundary by "ship channel" is to be construed as in-
tending the line of low tide; and the boundary of the town of Oak-
land as defined by that act, commencing at the intersection of the
northeast line with the line of low tide on the northern branch of
the estuary, follows the line of low tide on said branch to the mouth
of the eastern basin, crosses said mouth, and continues along the
line of low tide on the southern side of the estuary to its mouth in
the bay, and thence follows. the line of low tide northerly and east-
erly till it intersects the northeastern boundary; and the grant to
Oakland was of the lands lying between high-water mark and ship
channel, within these boundaries, and included nothing west of the
line of low tide on the bay front, and nothing beyond the line of
low tide on the north and west shore of the estuary, the estuary be-
ing itself navigable, and a part of "ship channel."

ID.—LINE CROSSING EASTERN BASIN OF ESTUARY—EXTENSION OF SOUTHERLY
LINE FROM HEADLAND TO HEADLAND.—The rule in surveying boundaries
defined by streams or other waters is to follow the stream or body
of water, crossing the mouth of affluents or other inlets from head-
land to headland; and in determining the boundary of the town of
Oakland, which extends from the intersection of the northeast
boundary with the southerly line of San Antonio creek or estuary,
"down the southerly line of said creek to its mouth in the bay," the
legislative conception of. the creek or estuary is that it has a head
above its intersection with the northeastern boundary line, and a
mouth in the bay, and the southerly line of the creek at low tide
must cross the mouth of the eastern basin of the estuary from head-
land to headland, and cannot stop from going down the southerly
line of the creek or estuary, to ascend and make the circuit of the
eastern basin.

ID.—STRICT CONSTRUCTION OF MUNICIPAL BOUNDARIES—CONNECTION WITH
STATE GRANT—GENERAL WELFARE.—Where the boundaries of a gratuitous
donation of lands from the state depend upon the boundaries of a
municipal corporation fixed by the same act which makes the grant,
the entire act, including the boundaries of the municipal corporation,
is brought within the rule of strict construction against the grantee;
but, considered without reference to the donation of lands, the

grant of the municipal franchise is to be construed in a manner most conducive to the general welfare, and a strict construction of the act defining municipal boundaries will be enforced, where the general welfare and the rights of other communities require it.

ID.—REINCORPORATION OF TOWN AS CITY—CHANGE OF BOUNDARY NOT RETRO-ACTIVE UPON PROPERTY RIGHTS— HIGH TIDE UPON ESTUARY—LEGISLATIVE CONSTRUCTION DISREGARDED.—The act of 1854 (Stats. 1854, p. 184) by which the town of Oakland was reincorporated as the city of Oakland, and the rights and duties of the town were devolved upon the city, and by which it was enacted that the boundaries of the city should be the same as those of the town, but which specifically described "the eastern and southern high tide line" of the slough and estuary of San Antonio, as one of the boundaries, with a proviso saving the rights of the citizens of Clinton and San Antonio to construct wharves at their respective sites, whatever effect it may have had in extending the limits of the city from and after its passage, cannot be allowed any retroactive effect upon the property rights of the city or other grantee, which must be determined by the proper judicial construction of the act of 1852, regardless of any subsequent change in the city limits; and the construction which the act of 1854, and the subsequent act of April 24, 1862 defining the boundaries of the town of Oakland, sought to place upon the act of 1852, being erroneous, must be disregarded by the courts in determining the property rights depending upon that act.

ID.—POWER OF STATE TO ALIENATE TIDE LANDS—PUBLIC RIGHTS OF NAVIGA-TION AND FISHERY—CHICAGO CASE—GRANT TO TOWN OF OAKLAND.—The state has full power to alienate lands which are covered and uncovered by the daily flux and reflux of the tides, subject only to the rights of the public to use them for the purposes of navigation and fishery; and such lands are alienable in private ownership where capable of reclamation without detriment to the public right, and especially where their reclamation will be of advantage to navigation and commerce; and there is nothing in the doctrine established by the case of *Illinois Central R. R. Co. v. Illinois,* 146 U. S. 387, relative to the nonalienability of lands continually submerged beneath the waters of Lake Michigan in the harbor of Chicago, which is inconsistent with the right of the state of California to grant to the town of Oakland the mud flats and shoals along its water-front lying between high and low tide, with a view to facilitate the construction of wharves and other improvements, it not appearing that such grant has impaired the power of succeeding legislatures to regulate, protect, improve, or develop the public rights of navigation and fishery.

ID.—POWER OF OAKLAND TO ALIENATE ENTIRE WATERFRONT—QUESTION OF LEGISLATIVE INTENT—PUBLIC TRUST—INVALID TRANSFER TO PRIVATE CITIZEN.—The town of Oakland had no power to alienate its entire waterfront, unless such power was conferred upon it by the legislature; and whether it was conferred or not is a question of legislative intent, to be gathered from the terms of the statute construed with reference to its general scope and purpose; and the clear intent of the act creating the town of Oakland, and granting to it the tide

CXVIII. CAL.—11

lands along its water front, was to confer upon it a public trust for the improvement of commercial facilities by the erection of convenient wharves along its waterfront, and the regulation and collection of wharfage and dockage for their use, which public trust it could neither delegate nor abdicate, nor was any power conferred upon it to alienate the tide lands, which were essential to the exercise of its power to erect wharves and regulate tolls; and an attempt by the town to invest a private citizen with the exclusive right to erect wharves and regulate tolls, and to transfer to him the entire waterfront, in consideration of his erecting wharves thereon, was unauthorized and void.

ID.—LIMITED POWER OF ALIENATION—PROVISION FOR STREETS AND WHARVES —SALE OF LANDS BY PARCELS—SALE IN BULK VOID.—The intention of the law was that the streets of the town should be protracted to the waterfront, the intervening spaces divided into blocks and lots, and sold in subdivisions, in such manner as to preserve to the public ample means of access to the navigable waters of the bay and estuary, and to the municipal authorities ample space for the erection of wharves, piers, and docks, and if any reasonable measures to this end had been taken, a sale of the lands by parcels would have been a proper exercise of power by the municipal authorities; but a transfer in bulk to a private citizen, without any reservation of the right of access to navigable waters by which the town was largely surrounded, was a gross and evident excess of power.

ID.—DISMISSAL OF SUIT IN EQUITY BY CITY—MANDATE OF SUPREME COURT— RES ADJUDICATA—QUESTION OF TITLE UNDETERMINED.—The dismissal of a suit in equity brought by the city of Oakland to set aside the grant of the waterfront assumed to have been made by the town as being fraudulent and void, which was dismissed in obedience to a mandate of the supreme court, whose decision left the question of title in the grantee undetermined, and adjudged that there was no ground in equity for the relief asked for, and that, if the grant was void, the city could disregard it, and assert its rights in any appropriate manner, is not res adjudicata upon the question of title, and does not estop the city to assert the void character of the grant in a subsequent action.

ID.—LEGISLATIVE RATIFICATION OF TOWN ORDINANCE—CONFIRMATION OF VOID GRANT—POWER OF LEGISLATURE—QUESTION OF INTENTION UNDETERMINED. It was within the power of the legislature to vest title to the tide lands on the Oakland waterfront in the grantee of the town under a void ordinance of the town, purporting to grant the same, by legislation clearly ratifying such ordinance; but the question whether the act of 1861, amending section 12 of the city charter so as to provide that "the ordinances of the board of trustees of said town are hereby ratified and confirmed," was intended to include a void special ordinance purporting to grant the entire waterfront to a private citizen, or whether it was only intended to include general ordinances of a legislative character, is one upon which the justices of the court are disagreed, and is undetermined.

ID.—WATERFRONT LANDS NOT SUBJECT TO EXECUTION.—The lands between high and low tide along the waterfront of Oakland, being held by

the town subject to the public trust of laying out streets through them, and using them as sites for wharves, docks, piers, and other essential aids to commerce, and to the traffic of a seaport town, were not subject to levy and sale under execution against the town.

ID.—VALID COMPROMISE UNDER LEGISLATIVE AUTHORITY—TITLE CONFIRMED IN WATERFRONT COMPANY—EXCEPTIONS—PUBLIC EASEMENTS.—The compromise effected in April, 1868, between the city of Oakland, the Oakland Water Front Company, and the Western Pacific Railroad Company, pursuant to authority given by the act approved March 21, 1868, the passage of which was especially obtained by the parties, and by the terms of which the city council and mayor of Oakland were authorized and empowered to compromise, settle, and adjust any and all claims, demands, and controversies, and causes of action, in which the city was interested, was valid and effective; and after the date of said compromise, the city of Oakland had no ownership, as trustee or otherwise, of any portion of her waterfront, except those portions secured to her by the compromise, and such streets, thoroughfares, and other parcels as were previously dedicated to public use; and the title of the Oakland Water Front Company and its assigns to the entire waterfront was confirmed subject to those exceptions, and to the public easements and right of control in the city over the lands so dedicated.

ID.—REASONABLENESS OF COMPROMISE—DISCRETION OF MAYOR AND COUNCIL —ABSENCE OF FRAUD.—The question as to the reasonableness or unreasonableness of the compromise, and as to what the city should exact or concede in making it, was a matter confided to the discretion of the mayor and council, and, in the absence of fraud, their judgment thereupon was conclusive.

ID.—STREETS AND PUBLIC PLACES—CITY NOT ESTOPPED BY CONSENT DECREES— STATUTE OF LIMITATIONS INAPPLICABLE.—With respect to streets and public places dedicated to public use, the city is not estopped by consent decrees, and the statute of limitations does not apply.

APPEALS from a judgment of the Superior Court of Alameda County and from an order denying a new trial. F. B. Ogden, Judge.

The facts are stated in the opinion of the court.

A. A. Moore, J. C. Martin, H. S. Brown, John Garber, and W. F. Herrin, for Oakland Water Front Company, Appellant in Appeal No. 527 and Respondent in Appeal No. 389.

The city of Oakland is estopped from bringing this action by its conduct and acquiescence. Municipalities and states may be thus estopped. (*State etc. v. Flint etc. Ry. Co.*, 89 Mich. 481, 487; *State etc. v. Jackson etc. R. R. Co.*, 69 Fed. Rep. 116; *Cohn v. Barnes*, 5 Fed. Rep. 326; *Hough v. Buchanan*, 27 Fed. Rep.

328; *Pengra v. Munz*, 29 Fed. Rep. 830; *Indiana v. Milk*, 11 Fed. Rep. 389; *United States v. Dalles etc. Road Co.*, 41 Fed. Rep. 493; *Commonwealth v. Andre*, 3 Pick. 224; *Williamsburg Sav. Bank v. Solon*, 138 N. Y. 465; *Moran v. Commissioners of Miami County*, 2 Black, 722; *County of Moultrie v. Savings Bank*, 92 U. S. 631; *Kneeland v. Gilman*, 24 Wis. 39; *Commonwealth v. Pejepscut etc.*, 10 Mass. 155; *County of Randolph v. Post*, 93 U. S. 502; *Zabriskie v. Cleveland etc. R. R. Co.*, 23 How. 381; *Brookhaven v. Smith*, 118 N. Y. 634.)    The enforcement of municipal taxes against the Oakland Water Front Company estops the city to question its title. (*Fresno v. Fresno etc. Irrigation Co.*, 98 Cal. 179; *Adams County v. Burlington etc. R. R. Co.*, 39 Iowa, 507, 510; *Audubon County v. American Emigrant Co.*, 40 Iowa, 460; *Austin v. Bremer County*, 44 Iowa, 155; *Simplot v. Dubuque*, 49 Iowa, 630; *Smith v. Osage*, 80 Iowa, 84; *State v. Flint etc. Ry. Co.*, *supra; Diamond Coal Co. v. Fisher*, 19 Pa. St. 267; *Murphy v. Packer*, 152 U. S. 398; *State v. Milk*, 11 Biss, 197; *Breaux v. Negrotto*, 43 La. Ann. 426; *People v. Hagadorn*, 104 N. Y. 516.) Oakland is estopped by the judgment of absolute dismissal of the action of *Oakland v. Carpentier*, 13 Cal. 540, with no reservation of a right to bring a new action. (*Durant v. Essex Co.*, 7 Wall. 107; *Gove v. Lyford*, 44 N. H. 525; *Foote v. Gibbs*, 1 Gray, 412; *Thurston v. Thurston*, 99 Mass. 39; *Bradley v. Bradley*, 160 Mass. 258; *Perine v. Dunn*, 4 Johns. Ch. 140; *Forist v. Bellows*, 59 N. H. 229; *Knowlton v. Hanbury*, 117 Ill. 471–74; *Jenkins v. Johnston*, 4 Jones Eq. 151; *Curts v. Trustees*, 6 J. J. Marsh. 536; *Thompson v. Clay*, 3 T. B. Mon. 359; 16 Am. Dec. 108; *Messinger v. New England Mut. Life Ins. Co.*, 59 Fed Rep. 416; *Alley v. Nott*, 111 U. S. 472; *Bissell v. Spring Valley Tp.*, 124 U. S. 225; *Williams v. Hollingsworth*, 5 Lea, 358; *Goebel v. Iffla*, 111 N. Y. 170, 177; *Gates v. Preston*, 41 N. Y. 113; *Cochran v. Couper*, 2 Del. Ch. 27; *Parrish v. Ferris*, 2 Black, 606; *Case v. Beauregard*, 101 U. S. 688; *Lyon v. Perin etc. Co.*, 125 U. S. 698.) The city is estopped by the judgment notwithstanding its claim to be a trustee for the public. (*San Francisco v. Holladay*, 76 Cal. 18; *San Francisco v. Itsell*, 80 Cal. 57; *People v. Holladay*, 93 Cal. 241; 27 Am. St. Rep. 186; 102 Cal. 661; *Los Angeles v. Cohn*, 101 Cal. 373–77.)    In every case of dismissal not otherwise provided for by statute, the judgment of dismissal is upon

the merits. (Practice Act, sec. 149; *Merritt v. Campbell*, 47 Cal. 542; *Phillpotts v. Blasdell*, 10 Nev. 19; *United States v. Parker*, 120 U. S. 95.) The stipulated judgment in favor of the Oakland Water Front Company quieting its title against the city of Oakland is a bar to the present action, there being no impeachment of it for fraud, collusion, or mistake of fact. (*Holmes v. Rogers*, 13 Cal. 191; *Semple v. Wright*, 32 Cal. 659; *Merritt v. Campbell, supra; McCreery v. Fuller*, 63 Cal. 30; *Partridge v. Shepard*, 71 Cal. 470; *Crossman v. Davis*, 79 Cal. 603, 604; *Phillpotts v. Blasdell, supra; Thompson v. Maxwell etc. Ry. Co.*, 95 U. S. 397; *Nashville etc. Ry. Co. v. United States*, 113 U. S. 261; *United States v. Parker*, 120 U. S. 95; *White v. Crow*, 17 Fed. Rep. 98; *Derby v. Jacques*, 1 Cliff. 425; *Armstrong v. Cooper*, 11 Ill. 540–42; *Flagler v. Crow*, 40 Ill. 414; *Indiana etc. Ry. Co. v. Bird*, 116 Ind. 217; 9 Am. St. Rep. 842; *Gifford v. Thorn*, 9 N. J. Eq. 702.) A municipal corporation authorized by the legislature to compromise a disputed claim or a pending suit concludes itself by such compromise. (*People v. Coon*, 25 Cal. 635; *Hall v. Baker*, 74 Wis. 118; *Board of Liquidation v. Louisville etc. R. R. Co.*, 109 U. S. 221; *County of Dakota v. Glidden*, 113 U. S. 222; *Petersburg v. Mappin*, 14 Ill. 193; 56 Am. Dec. 501; *Agnew v. Brall*, 124 Ill. 312; *Grimes v. Hamilton Co.*, 37 Iowa, 290.) The state had authority to dispose of tide and submerged lands upon the waterfront of the bay and estuary. (*Eldridge v. Cowell*, 4 Cal. 80; *Chapin v. Bourne*, 8 Cal. 294; *Hyman v. Read*, 13 Cal. 444; *Holladay v. Frisbie*, 15 Cal. 630; *Wheeler v. Miller*, 16 Cal. 124; *Bondurant v. Watson*, 103 U. S. 281; *Burgess v. Seligman*, 107 U. S. 20, 33; *Gage v. Pumpelly*, 115 U. S. 454; *Hardin v. Jordan*, 140 U. S. 371; *Shively v. Bowlby*, 152 U. S. 1; *Baer v. Moran Bros. Co.*, 153 U. S. 287; *Mann v. Tacoma Land Co.*, 153 U. S. 273; *Brookhaven v. Strong*, 60 N. Y. 56; *Trustees v. Smith*, 118 N. Y. 634; *Mayor etc. v. Hart*, 95 N. Y. 443; *Langdon v. Mayor etc.*, 93 N. Y. 129; *Commonwealth v. Alger*, 7 Cush. 53; *Ramsey v. New York etc. R. R. Co.*, 114 N. Y. 427; *Hoboken v. Pennsylvania R. R. Co.*, 124 U. S. 657; *Gough v. Bell*, 22 N. J. L. 456, 457; *People v. New York etc. Co.*, 68 N. Y. 77, 78; *Nichols v. Boston*, 98 Mass. 42; 98 Am. Dec. 132; *Hinman v. Warren*, 6 Or. 410; *Parker v. Taylor*, 7 Or. 446, 447; *Bowlby v. Shively*, 22 Or. 416; *Lewis v. Portland*, 25 Or. 133; 42 Am. St.

Rep. 772; *Case v. Loftus*, 39 Fed. Rep. 730; *Scurry v. Jones*, 4 Wash. 468; *Eisenbach v. Hatfield*, 2 Wash. 236; *Boston v. Le Craw*, 17 How. 432, 433; *Fitchburg R. R. Co. v. Boston etc. R. R. Co.*, 3 Cush. 86, 87; *Winnisimmett Co. v. Wyman*, 11 Allen, 432; *Hamlin v. Pairpoint Mfg. Co.*, 141 Mass. 51; *Austin v. Rutland Ry. Co.*, 17 Fed. Rep. 46C; 45 Vt. 215; *State v. Cozzens*, 2 R. I. 561; *Engs v. Peckham*, 11 R. I. 210; *Gerhard v. Seekonk etc. Commrs.*, 15 R. I. 334; *East Haven v. Hemmingway*, 7 Conn. 186; *Prior v. Swartz*, 62 Conn. 132, 136, 138; 36 Am. St. Rep. 333; *American Dock etc. Co. v. Public School Trustees*, 39 N. J. Eq. 409; *Potomac Steamboat Co. v. Upper Potomac etc. Co.*, 109 U. S. 672; *Hardy v. McCullough*, 23 Gratt. 251; *Norfolk City v. Cooke*, 27 Gratt. 435; *McCready v. Virginia*, 94 U. S. 391; *Hatfield v. Grimstead*, 7 Ired. 139; *Bond v. Wool*, 107 N. C. 148, 150; *Gregory v. Forbes*, 96 N. C. 77; *State v. Narrows Island Club*, 100 N. C. 477; 6 Am. St. Rep. 618; *Rivas v. Solary*, 18 Fla. 122; *Galveston v. Menard*, 23 Tex. 349; *Hogg v. Beerman*, 41 Ohio St. 81; 52 Am. Rep. 71.)

William R. Davis, W. Lair Hill, E. J. Pringle, and H. A. Powell, for City of Oakland, Respondent in Appeal No. 527, and Appellant in Appeal No. 389.

The town of Oakland could not pass the legal title to the lands on the waterfront by ordinance. (Dillon on Municipal Corporations, 4th ed., secs. 581, 582; *Oakland v. Carpentier*, 13 Cal. 540.) The confirmatory act of 1854, applies to legislative ordinances generally, and cannot be presumed to have been intended to give away the property of the city by confirming a void granting ordinance. (*San Diego Water Co. v. San Diego*, 59 Cal. 521, 522; Endlich on Interpretation of Statutes, secs. 113, 114; *United States v. Fisher*, 2 Cranch, 400.) The act of March 21, 1868, did not apply to the title of the city, there being no "controversy" to which it applied, and it did not embrace the subject matter of the waterfront. (*Haseltine v. Hewitt*, 61 Wis. 121.) The compromise was unreasonable in that it gave away substantially the entire waterfront. (*San Diego v. San Diego etc. R. R. Co.*, 44 Cal. 113, 114.) The legislature cannot give away property held by the city upon a public trust, nor sanction an unauthorized conveyance of it. (*San*

*Francisco v. Itsell*, 80 Cal. 57; *Weisenberg v. Truman*, 58 Cal. 63; *People v. Kerr*, 27 N. Y. 188; *Ligare v. Chicago*, 139 Ill. 46; 32 Am. St. Rep. 179; *Matthews v. Alexandria*, 68 Mo. 115; 30 Am. Rep. 776.) The consent judgment could not estop the city as to property held by it upon a public trust. (*San Francisco v. Le Roy*, 138 U. S. 656; *Jenkins v. Robertson*, L. R. 1 Sc. & Div. App. Cas. 117; *Kelly v. Milan*, 127 U. S. 139; *Branham v. San Jose*, 24 Cal. 604.) The dismissal of the bill in *Oakland v. Carpentier*, supra, did not conclude the rights of the city. (*Fulton v. Hanlow*, 20 Cal. 450; *Rosenthal v. McMann*, 93 Cal. 508, 509; *Flandreau v. Downey*, 23 Cal. 354; *Davenport v. Turpin*, 43 Cal. 597; *Russell v. Place*, 94 U. S. 606.) The waterfront being devoted to public use could not be sold under execution. (*Darlington v. Mayor etc.*, 31 N. Y. 164; 88 Am. Dec. 248; *Ranson v. Boal*, 29 Iowa, 68; *Hart v. Burnett*, 15 Cal. 530.) The statute of limitations is not applicable to this case. (*Weber v. Harbor Commrs.*, 18 Wall. 67.) The grant to Carpentier was necessarily revocable from the nature of the case, and was in fact revoked. (*Illinois Cent. R. R. Co. v. Illinois*, 146 U. S. 387.)

BEATTY, C. J.—This is an action to determine conflicting claims to real estate. The subject of the controversy is the land granted to the town of Oakland, by the original act of incorporation, passed May 4, 1852. (Stats. 1852, p. 180.)

The claim of the plaintiff is, that as successor to the town of Oakland it continues to be the owner of the land so granted. The defendant, as successor to Horace W. Carpentier, claims that the entire grant to the town of Oakland was, within a few days after the organization of the town council, transferred to Carpentier by ordinance and deed of conveyance; that such transfer was subsequently confirmed and ratified by other ordinances and proceedings of the town and city, by acts of the legislature, by the estoppel of judgments and estoppels *in pais*, and that its title so acquired is fortified by deeds made in pursuance of execution sales on judgments against the town, and perfected by prescription under the statute of limitations. So far as I may find it necessary to discuss these various deraignments of title their particulars will be stated as they arise.

As the findings and decree of the superior court, as well as a principal part of the argument of counsel for respondent, are based upon a certain assumption as to the size and location of the grant, it becomes a point of capital importance to determine at the outset whether that assumption is well founded, for if it shall appear that it is based upon a radical misconstruction of the act of incorporation, and that the grant is really of much less extent than has been so assumed, it must necessarily follow that the conclusions of the superior court, and the argument based upon them, will be to some extent invalidated.

In determining this point we shall not be greatly assisted by the labors of counsel, for, since both parties are contending for the land granted, each is naturally interested in maintaining a construction of the grant which will give it the widest possible extent.

It is true that at the hearing of this appeal counsel for defendant, for the purpose of avoiding the force of the argument based upon the supposed inordinate extent of the grant to Carpentier, suggested, rather than contended, that perhaps the grant did not embrace so much of the submerged land on the bay front of the city as the superior court and counsel for the plaintiff have assumed. They did not, however, frankly and unequivocally take that position, and the concessions they seemed inclined to make do not include all that is required by any consistent construction of the act of incorporation.

As to the plaintiff, its interests, of course, demand that it should contend for the most liberal construction of the grant; for the greater its extent the stronger is the argument founded on the doctrine of the Chicago case (*Illinois Cent. R. R. v. Illinois,* 146 U. S. 387) against the validity of its alleged transfer to a natural person or private corporation, and the greater the prize to be obtained by the success of the argument. Naturally, therefore, we find counsel for plaintiff confidently asserting as a matter beyond controversy that the grant to the town of Oakland embraced the whole of the estuary of San Antonio, including what is now called the eastern or Brooklyn basin, up to the line of high-water mark on all sides of that inlet, and that it extended out into the bay of San Francisco to the three or four fathom line at low tide, containing in all eight thousand acres of land,

spreading out like a fan on the bay front, and covering at its outer edge more than the entire frontage of Oakland and Alameda.

I find myself constrained to dissent radically from this view, and since the settlement of this question at the outset is essential to a proper discussion of the case, I shall here state my own construction of the grant, with the reasons upon which it is founded.

The grant to the town of Oakland is contained in the third section of the original act of incorporation (Stats. 1852, p. 181), and the description is in these words: "The lands lying within the limits aforesaid [i. e., the corporate limits of the town as defined in the first section of the act]   between high tide and ship channel."

Such being the terms of the grant, it is evident that its extent and location depend primarily upon the proper construction to be given to the first section of the act defining the corporate limits.   The boundaries of the town are defined as follows: "On the northeast by a straight line at right angles with Main street, running from the bay of San Francisco on the north to the southerly line of the San Antonio creek, or estuary, crossing Main street at a point three hundred and sixty rods northeasterly from 'Oakland House,' on the corner of Main and First streets, as represented on Portios' map of 'Contra Costa,' on file in the office of the secretary of state; thence down the southerly line of said creek, or slough, to its mouth in the bay; thence to ship channel; thence northerly and easterly by the line of ship channel to a point where the same bisects the said northeasterly boundary line."

The first point of difficulty that presents itself in giving a construction to this language is to determine what is the southerly line of San Antonio creek, or estuary.   There are two, and only two, definite lines of that creek on the southern side, viz., the line of high tide and the line of low tide.   It is sufficiently clear that one or the other of these two lines was intended by the legislature, but the question remains, Which was intended?

It has been assumed throughout the argument, and I understand both parties to be agreed in this claim, that the intention of the legislature was to extend the corporate limits of Oakland to the line of high tide on the opposite side of the estuary, and to carry it around the eastern or Brooklyn basin.

There is not, in my opinion, any possible ground for such a construction of the original act of incorporation, though it is true that a subsequent legislature did its best to legislate such a construction into the original act. The first symptom of this attempt at legislative construction is to be found in the second section of the act of 1854 (Stats. 1854, p. 184), by which the town of Oakland was reincorporated as the city of Oakland, and the rights and duties of the town devolved upon the city. It is there enacted that the boundaries of the city shall be the same as those of the present town, but a proviso is added saving the right of the citizens of the towns of Clinton and San Antonio to construct wharves at their respective sites, which seems to imply that the eastern basin was regarded as a part of Oakland. This proviso may have been inserted by the legislature out of an abundant caution merely, or it may have been deliberately intended by the framer of the act to give a certain plausibility to the pretensions more fully disclosed in the amendment to this section of the act of 1854, contained in the act of May 15, 1861 (Stats. 1861, p. 386), in which the description of the corporate boundaries is expanded as follows:

"Sec. 2. The boundaries of said city shall be the same as the boundaries of the late town of Oakland, which are more particularly defined and described as follows, to wit: Northerly by a straight line drawn at right angles with Broadway, formerly Main street, in said city, crossing the extended line of Broadway at a point three hundred and sixty rods northerly from where formerly stood the 'Oakland House,' on the northwest corner of Broadway and First streets, and running from the bay of San Francisco on the west to the easterly or southeasterly line of that branch of the San Antonio slough or estuary, over which crosses the bridge from Oakland to Clinton; thence along the eastern and southern high tide line of said slough and of the estuary of San Antonio, following all the meanderings thereof to the mouth of said estuary, in the bay of San Francisco; thence southwesterly to ship channel; thence northerly along the line of ship channel to a point where the same intersects the said northerly boundary line extended westerly; provided, that nothing in this section contained shall be so construed as to prohibit or abridge the rights of the trustees of the towns of Clinton and San Antonio, whenever the citizens thereof may elect to become a body corpo-

rate under the provisions of an act for the incorporation of towns, or under the provisions of any act which may hereafter be passed, to provide for the construction of wharves and other improvements for the accommodation and convenience of the trade, travel, and commerce of the said towns or villages, at their respective sites."

Whatever effect this amendment may have had in extending the municipal limits of the city of Oakland from and after the date of its passage, it cannot be allowed any retroactive effect upon the property rights of the city or of her grantees, and if the construction which it attempts to place upon the act of 1852 is erroneous, as it clearly is, the courts, in determining the rights of the parties to this action, not only may, but must, disregard it. The same remarks are applicable to the act of April 24, 1862, (Stats. 1862, p. 337), by the second section of which the legislature again sought to give a more particular definition to the original boundaries of the town of Oakland, and in so doing extended it to the highest tide line of the estuary, thereby including a wide expanse of salt marsh above the level of ordinary high tide.

What, then, is the proper construction of the act of 1852? I think it clear that the southerly line of the San Antonio creek or estuary intended by the act was the line of low tide, and not the high tide line, and that this line was to be followed down the creek to the bay, crossing the mouth of the narrow channel connecting with the eastern basin, and not ascending that channel, and following around the basin. If we were dealing with a grant of lands pure and simple, made by the state out of its mere bounty and not upon any valuable consideration, this conclusion would follow inevitably from a principle of construction based upon the presumption that always attends upon such grants, viz., that the words of the grant are attributable to the party securing the legislation, or, in other words, to the grantee; and, consequently, that all ambiguities or uncertainties in its terms are to be resolved in a manner most favorable to the state and least favorable to the recipient of its bounty. But this is not a mere grant of lands, and it may be argued that a more liberal rule of construction is applicable to a law defining the boundaries of a municipal corporation. It would seem to be a sufficient answer to this sug-

gestion to say that if this is not a grant of lands pure and simple, neither is it purely and simply an act of incorporation. It contains also a gratuitous donation of lands—a grant sufficiently munificent upon any construction—and because the boundaries of the grant depend upon the boundaries of the corporation the entire act is brought within the reason of the rule of strict construction above stated.

There is, moreover, another and distinct ground for holding to a strict construction of that part of the act defining the municipal boundaries considered without reference to the grant of lands. The state acts for the public good, and all its grants, including the grant of municipal franchises, are to be construed in a manner most conducive to the general welfare. The town of Oakland as incorporated was situated upon one side of a navigable estuary—navigable in fact and so declared by law. Upon the opposite sides of the estuary were the towns of Clinton and San Antonio, communities as much entitled to the bounty and consideration of the state as the inhabitants of Oakland. These communities, and those to grow up in the future on the southern border of the estuary—then unoccupied—had a natural right to the common use of this body of navigable water, to unrestricted access to its shores, and to the privilege of constructing wharves, docks, piers, and other aids to commerce, fully equal to that of the people of Oakland. It was, therefore, a stretch of liberality on the part of the state to include the whole of the estuary, even to low-water mark on its southern and eastern side, in the limits of Oakland, and it would have been a gross and indefensible excess of liberality to extend its boundaries to include the margin between high and low water mark on that side, thus depriving other communities of privileges of vital importance to them, without any corresponding benefit to Oakland. In saying this I do not forget that a subsequent legislature did, in the manner above stated, actually extend the boundaries of the city of Oakland so as to include the whole estuary, eastern basin and all, to high-water mark on all sides, and did attempt to say that such was the effect of the original act of 1852. As to this attempt of the legislature to impose a construction upon the act of a former legislature, I have already stated my opinion that it was nugatory; and as to the extension of the boundaries

of Oakland effected by the amendment—if such was its effect—
it may be remarked that its excessive liberality was materially
qualified by the proviso reserving to the inhabitants of the towns
of Clinton and San Antonio the right to construct wharves and
other conveniences for trade and travel at their respective sites
as means of access to the navigable waters of the estuary. True,
there was no reservation of the same rights to the future in-
habitants of Alameda on the south side of the estuary, but the
fact that one legislature has improvidently extended the munici-
pal boundaries in one direction is no reason for holding that an
ambiguous grant of a former legislature should be construed in
a sense which would render it similarly improvident with respect
to the corporate limits, and infinitely more so in its disposition
of public navigable waters.

As to the principle which I have assumed governs in the con-
struction of gratuitous donations by the state, I have not taken
the trouble to cite the authorities which sustain it, but they are
abundant and I think uniform. The case of *Hyman v. Read,* 13
Cal. 444, may seem to be an exception, but really is not. The
conclusions there announced are based altogether upon a dissent-
ing opinion of Judge Story, in a case in which the decision of
the supreme court of the United States was to the opposite effect.
(*Charles River Bridge v. Warren Bridge,* 11 Pet. 582, 600, 601.)
But even the views of Judge Story, as expressed in that opinion,
and the numerous authorities cited by him, are in entire accord
with the proposition above stated. He makes the distinction be-
tween free gifts and grants upon a valuable consideration, and
admits that the rule of strict construction applies to the former,
and especially he admits "that where the terms of a grant are to
impose burdens upon the public or to create a restraint injurious
to the public interest, there is sound reason for interpreting the
terms, if ambiguous, in favor of the public"; though at the same
time he insists "that there is not the slightest reason for saying,
even in such a case, that the grant is not to be construed favorably
to the grantee, so as to secure him in the enjoyment of what is
actually granted." All that Judge Story contends for in that
dissenting opinion may be freely conceded without affecting the
conclusion that this grant to Oakland, as to which there can be
no pretense of a valuable consideration, must be strictly con-
strued.

As to the case of *Hyman v. Read, supra,* the discussion therein upon this point seems to have been entirely unnecessary, if not *obiter,* because there was really no ambiguity in the terms of the grant there in question. But, even if the point was involved, the decision recognized the distinction between a grant based upon a valuable consideration, and free gifts of the public domain, and this must have been the real ground of the decision, for the other reasons mentioned in that connection appear to be either unfounded or inconclusive. It is said, for one thing, that it was not a grant made at the suit or solicitation of the grantee. But how did this appear? Grants to a favored donee by a special act of the legislature, if gratuitous, are always presumed to have been solicited, and therefore the only reason for saying that the grant to San Francisco was not solicited was that it was not gratuitous, and so both of these grounds are resolved into the same thing. The third reason assigned, "that it is the deliberate public act of the legislature," is a perfect instance of arguing in a circle. Every gift of the public domain is made by public act of the legislature, and every such act is presumed to be deliberate. The proposition, therefore, amounts simply to this, that a public grant must be liberally construed because it is a public grant. It is only fair, however, to add to this analysis of the proposition a quotation from Judge Story's opinion which probably explains its real meaning. He says: "In the case of a legislative grant there is no ground to impute surprise, imposition, or mistake to the same extent as in a mere private grant of the crown. The words are the words of the legislature upon solemn deliberation and examination and debate. Their purport is presumed to be known, and the public interests are watched and guarded by all the varieties of local, personal, and professional jealousy, as well as by the untiring zeal of members devoted to the public service."

This is a beautiful theory, but it scarcely accords with the well-known fact that the legislature has but little time to deliberate upon the mass of bills brought before it, and that it is very often imposed upon, and oftener still mistaken as to matters vitally connected with the subjects of legislation. It would seem that all the reasons for protecting the king of England against his own improvidence in granting crown lands would apply with double force to grants by a modern legislature. In recognition of

this fact, our own legislature has made it statute law that "every grant by a public officer or body, as such, to a private party, is to be interpreted in favor of the grantor." (Civ. Code, sec. 1069.) It is certain, moreover, that the principle of construction sustained by the weight of recent authority is that stated by Justice Shiras in his dissenting opinion in the Chicago case (*Illinois Cent. R. R. v. Illinois*, 146 U. S. 468), where he says: "It must be conceded, *in limine*, that, in construing this grant, the state is entitled to the benefit of certain well-settled canons of construction that pertain to grants by the state to private persons or corporations, as, for instance, that if there is any ambiguity or uncertainty in the act, that interpretation must be put upon it which is most favorable to the state; that the words of the grant, being attributable to the party procuring the legislation, are to receive a strict construction as against the grantee; and that, as the state acts for the public good, we should expect to find the grant consistent with good morals and the general welfare of the state at large and of the particular community to be affected."

These principles are equally applicable in the construction of every ambiguous term in the description of the boundaries of the town of Oakland, but resort to them is scarcely necessary in order to sustain the conclusion that the intention of the act was that the line on the estuary should cross the mouth of the eastern basin instead of ascending its outlet and passing around the main body. The legislative conception of the estuary is plainly indicated by the language of the act; it was regarded as a creek, or slough, with a head above the intersection of the northeast boundary line and a mouth in the bay, and the direction is, that the line shall follow "down the southerly line of said creek, or slough, to its mouth in the bay." In following this description there is no warrant for holding that on reaching the outlet from the eastern basin we are to stop following "down" the channel of the creek or slough, and turn aside to follow up this lateral affluent and around the wide, detached basin in which it has its source. The rule in surveying boundaries defined by streams or other waters is always to follow the stream or body of water, crossing the mouth of affluents or other inlets from headland to headland. Such was the method followed in surveying and patenting the pueblo grant of San Francisco, and considered in the case of

*Tripp v. Spring*, 5 Saw. 209, and in *Knight v. United States Assn.*, 142 U. S. 161. It is true that the decision of both of those cases was based upon the conclusiveness of the government patent against the state of California, and all persons claiming under the state, and that the true method of surveying the line on the bay was not necessarily or directly involved, but the question was directly and necessarily involved in all the proceedings in the courts, the land office, and the department of the interior, leading up to the issuance of the patent, and the method of survey approved by the department and followed in the patent was emphatically indorsed by the circuit and supreme courts. See, especially, the concurring opinion of Justice Field in the latter case, at pages 207 to 210, where, referring to the decision of the circuit court in the former case, among other things he says: "In addition to.this fact, it may be observed that at the time the circuit court was not ignorant of the universal rule governing the measurement of waters, to which the supreme court of the state makes no reference in its decision, and of which it seems to have been entirely oblivious, that where a water of a larger dimension is intersected by a water of a smaller dimension the line of measurement of the first crosses the latter at the points of junction, from headland to headland." It may be objected that this doctrine in the terms stated is not applicable to the present case because the eastern basin of the estuary of San Antonio is, as a matter of fact, a water of larger dimension than the other branch above the junction. But to this objection, if it should be made, there are two answers. In the first place, according to the coast survey map of 1859, which is one of the exhibits in the case, the eastern basin is not the larger body at the junction which is the controlling point. In the second place, it is evident that the legislature which passed the act did not regard the northern branch as an affluent of the eastern branch, for they place its "mouth" in the bay, and not at the junction. If it should be contended that neither was regarded as an affluent of the other, but each considered of equal importance, it can only be said that there is nothing to sustain the contention, while there is in the language of the act, evidence to the contrary. But conceding the point for the sake of the argument, the necessary result would be that, in following a line "down" either branch to its

mouth in the bay, we could not ascend the other branch from the junction. This reasoning does not seem to me to require corroboration, but if it does the same conclusion must follow from the rule of strict construction above stated.

I assume then, as a proposition thoroughly established, that the eastern and southerly boundary of the town of Oakland extended along the line of low tide on the estuary crossing the inlet of the eastern basin at its mouth, and continuing to the mouth of the estuary in the bay.

The next term of the description which requires construction is "thence to ship channel." What did the legislature mean by "ship channel"? It has been assumed that they meant the three fathom line or the four fathom line in the bay. But this assumption, which pervades the entire argument of counsel for the city, and seems to have guided the defendant in all its dealings with the subject of the controversy for a long series of years, has, so far as I can discover, no tangible basis.

It is certain some meaning must be ascribed to the term "ship channel" in order to give effect to the act, and it must be some precise and definite meaning; for the law abhors want of definition in matters of boundary as nature abhors a vacuum. Especially is this true with respect to the boundaries of a municipal corporation invested with power and authority to make and enforce local laws, civil and criminal. It is not to be supposed that the legislature, in conferring the municipal franchise upon the inhabitants of a local district, will purposely leave its boundaries in any respect uncertain. On the contrary, it must be assumed that the intention was to mark the boundary so exactly and definitely that no question could arise as to whether a particular spot was within or without the local jurisdiction. It is true this presumption of a precise and definite intention on the part of the legislature in the enactment of laws is often opposed to the actual fact. It frequently happens that the framers of a law have no well-defined idea of what they desire to accomplish or no capacity to give expression to their ideas. In such cases the difficult task is imposed upon the courts of discovering a meaning that never existed. Such, I think, is really the case here. The act under consideration is in many respects confused, incoherent, and ambiguous. In the case of *Oakland v. Carpentier,* 13 Cal. 550, Bald-

win, Justice, in the course of his opinion refers to it in these terms: "The charter is, perhaps, the most defective upon the statute-book, and this is saying a great deal. A perverse ingenuity seems to have been exercised to make it as lame and loose as possible. The joint labors of Malaprop and Partington could scarcely have made such a collocation or dislocation of words and sentences." But, in spite of the possibility that the framer of the law did not himself know what he intended, and the certainty that if he had a definite idea he has failed to give it definite expression, we must hold that "ship channel" was a line capable of location on the ground, and must determine where it ran. That it was a line different from the line of high tide is rendered certain by the fact that the land granted is described as lying between the line of high tide and ship channel, but beyond this it cannot be said that anything is certain. A witness in the case (Allardt) testified that he should consider the eighteen foot (three fathom) line at low tide the boundary of ship channel, but he was testifying more than forty years after the enactment of the law, and there is nothing to show that prior to its passage the words "ship channel" in that collocation had ever acquired, by general or local usage or by legal enactment, any such meaning. The channel of a river, strait, or bay, in the technical sense of the term, means the deeper part which can be most safely navigated, but in this sense it cannot imply any fixed depth of water, for it is entirely relative to the particular river, strait, or bay to which reference is made, and the deepest portion of one body of water may be shallow compared to the channel of another. And in the same body of water the channel for vessels of lighter draft would generally be more extensive than the channel for vessels of heavier draft, as it certainly is in front of Oakland. Ship channel, therefore—in this sense of the word "channel"—had no definite boundaries in the bay of San Francisco at the date of the passage of the act, and it is a purely arbitrary assumption to say that the three fathom line was intended. It could be said with exactly as much plausibility that the legislature meant the four fathom line or the two fathom line.

But perhaps some light may be thrown upon this question by a consideration of previous acts in which the expression "ship

channel" occurs.  Indeed, it would seem entirely reasonable to suppose that in two acts of the same legislature it was used on each occasion to signify the same thing.  By the act of April 21, 1851, entitled, "An act providing for the disposition of certain property" (Stats. 1851, p. 305), there was granted to the town of Martinez a strip of tide land a half mile in length in front of the town, the outer boundary of which was "the line of ordinary ship's channel."  The act, however, affords no clue to the meaning of these words, though it does very clearly evince the intention of the legislature that the land granted should be surveyed, subdivided, platted, and sold, and the proceeds used for the general improvement of the town, and particularly for the benefit of commerce by the construction of wharves, piers, docks, etc.

By the act of March 26, 1851, to provide for the disposition of the "beach and water lots" of San Francisco (Stats. 1851, p. 307), a permanent water front of the city was established.  The boundary of this waterfront was traced along the outer edge of the outermost streets as delineated on the map of a survey that had been previously made of the city front, and which extended beyond the line of low tide a considerable distance out into the bay and to deep water.  The survey terminated, however, at the intersection of the northern line of Jefferson street with the western line of Larkin street, and to define the waterfront from that point to the western boundary of the city it was provided that it should follow "the line of ship channel."  Now here we have an indication of the meaning of the term.  The waterfront established by law and ship's channel are coterminous—the line to which the city may extend its streets, and within which it may sell lots and authorize the purchasers to fill them up and occupy them, is waterfront.  Immediately beyond is ship channel, and it includes all the space between the piers and wharves which by the act of May 1, 1851 (Stats. 1851, p. 311) the city was authorized to extend from the end of every street terminating at the waterfront two hundred yards out into the channel.

This meaning of the law seems to me to be a fair deduction from the fact that the point at the northwest corner of Jefferson and Larkin streets is at the same time on the line of ship channel and on that of waterfront.  If the lines are coincident at one point, they must be coincident throughout as far as the survey

extends, and from the end of the survey to the western limits of the city the line of ship channel is nothing more nor less than the line to be fixed by the completion of the survey and legal establishment of the balance of the waterfront. I conclude, therefore, that the term "ship channel," as used in this earlier act relating to San Francisco, was intended to include all the navigable waters of the bay outside of what may be termed the bulkhead line as established by law.

But this does not fully solve the question as to Oakland, because there was not in 1852, and never has been, any law establishing a waterfront or bulkhead line in front of that city. We are, however, helped this far: ship's channel comprises the waters left free to navigation; and when we are required to locate its boundaries with precision, and no artificial boundary has been established by competent authority, we are driven to seek a definite natural boundary, if any such may be found, and here we do find such a boundary at the line of low tide. This is a definite line, and the only definite line beyond the line of high tide, and my conclusion is, that the line of low tide as it existed on the 4th of May, 1852, was the western boundary of the town of Oakland intended by the original act of incorporation. The only possible objection to this conclusion arising out of the terms of the act, so far as I can see, is that it is inconsistent with the implication of an interval between the mouth of the estuary and ship channel, contained in the words, "thence to ship channel." Of course, if we assume that the southern shore of the estuary at low-water mark is the southern boundary of the town, and the eastern shore of the bay at low-water mark is ship channel, there can be no interval between the mouth of the estuary and ship channel, and the words "thence to ship channel" must be rejected as superfluous. This, of course, would not be allowable if the whole description could be reconciled upon definite lines. But in fact it cannot; for, in addition to the impossibility of finding any definite line in the bay beyond low-water mark, there is another important and specific call in the description that must be rejected if we adopt the three fathom line or any other line of uniform depth in the bay that could be suggested. The call for the western boundary is "thence northerly and easterly by the line of ship channel to a point where

the same bisects the said northeastern boundary line." But the three fathom line does not run northerly and easterly; it runs throughout its whole extent in a uniform northwesterly direction, whereas the line of low tide from the mouth of the estuary at low tide (this point is marked by the intersection of the United States government bulkhead line with the jetty walls) exactly fulfills this call in the description; that is, its course is northerly and easterly—a circumstance sufficient in itself to counterbalance the force of the words, "thence to ship channel," in the previous call.

The result of this discussion may be briefly summed up as follows: The boundary of the town of Oakland, as defined by the act of May 4, 1852, commencing at the intersection of the northeast line with the line of low tide on the eastern side of the northern branch of the estuary, follows the line of low tide on said branch to the mouth of the eastern basin, crosses said mouth and continues along the line of low tide on the southern side of the estuary to its mouth in the bay, and thence follows the line of low tide northerly and easterly till it intersects the northeastern boundary line, as to the location of which there seems to be no dispute. The grant to Oakland was of the lands lying between high-water mark and ship channel, within these boundaries, and therefore included nothing west of the line of low tide on the bay front, and nothing beyond the line of low tide on the north and west shore of the estuary. I say nothing was included beyond this line along the estuary, because the estuary was itself a part of the ship channel, and there was no part of the town between it and high tide on the south and east side. My reason for saying that the estuary was a part of ship channel is, that it was in fact navigable, and that fact had been recognized and declared by an act passed only one day before the passage of the act incorporating Oakland. (Stats. 1852, p. 182.) By this act the "stream called San Antonio creek" was declared navigable from its mouth to the old embarcadero of San Antonio, and all obstructions to its navigation were forbidden. It is true this act does not seem to have included the northern branch of the estuary, but, in the view I take of the matter, legislative recognition of the fact of navigability was not necessary to constitute a ship channel. The fact was itself sufficient, and the coast

survey map shows that the northern branch was navigable for every class of vessels that could go to San Antonio. Each branch had a depth of two feet at low tide—the same as the depth on the bar at the mouth of the estuary, which meant a depth at full high tide of from seven to eight feet every twenty-four hours, and this was sufficient to accommodate a very important traffic. The contention so much insisted upon that the estuary was not a natural harbor, but has only been converted into a harbor by the works projected and carried out by the government, seems to rest upon the assumption that no body of water deserves to be called navigable unless large vessels can enter it in its natural condition at any stage of the tide. It is certain that the legislature which passed the act under which both parties claim entertained a different view, and applied that view to this identical body of water.

Having thus, as I think, conclusively shown that the subject of the controversy was a grant of much more moderate dimensions than has been assumed in the argument, the way is opened to a consideration of the question of ownership. Has the land so granted always remained the property of the town and its successor, the plaintiff, or did it pass from the town or the city by any of the various methods in which the defendant claims to have derived its asserted title?

If the conclusion above stated is sound—if the grant to Oakland comprised only the strip of land bounded by the lines of ordinary high and low tide, and extending along the estuary and bay front of the town—the case is at once relieved of the question so much discussed in the argument as to the power of the legislature to make such a grant to a private corporation or natural person; and the only question to be considered is, whether the state has in this instance made the grant as claimed. For there is nothing in the doctrine established in the Chicago case to impeach the power of the legislature of California, or of any state, to alienate tide lands—by which expression I am to be understood as referring to those lands only which are covered and uncovered by the daily flux and reflux of the tides.

The question to be decided in the Chicago case was, whether an act of the legislature of Illinois was constitutional which repealed a former act making a grant to a railroad corporation

of a tract of submerged land on the harbor front of the city, about a mile and a half in length by a mile in breadth, and including the whole of the works constructed by the federal government for the improvement and protection of the harbor, and at all times covered by deep water. In order to decide this question, it became necessary, of course, to consider to what extent lands of this character are alienable by the state, and this necessarily involved a discussion of the nature of the ownership and dominion of the several states in and over such lands. The conclusions of the court upon these points and the doctrine thereby established are conceded to be a necessary part of its decision, and I not only do not dissent from them, I entirely approve them. Stated briefly, I understand the doctrine of that case to be that the several states hold and own the lands covered by navigable waters within their respective boundaries in their sovereign capacity, and primarily for the purpose of preserving and improving the public rights of navigation and fishery. They have in them a double right, a *jus publicum* and a *jus privatum*. The former pertains to their political power—their sovereign dominion, and cannot be irrevocably alienated or materially impaired. The latter is proprietary and the subject of private ownership, but it is alienable only in strict subordination to the former. No grant of lands covered by navigable waters can be made which will impair the power of a subsequent legislature to regulate the enjoyment of the public right. The grantee takes the mere proprietary interest in the soil, and holds it subject to the public easement, and, if his ownership of the soil stands in the way of public works necessary or likely to become necessary for the improvement of navigation and in aid of commerce, the grant may be revoked upon the tender of a fair compensation for such lawful improvements as may have been made by the grantee in pursuance of any express or implied license contained in the grant. But in perfect accord with this doctrine it was also held that the state might alienate irrevocably parcels of its submerged lands of reasonable extent for the erection of docks, piers, and other aids to commerce. It was further conceded to be a proper exercise of the power of the state to establish harbor lines and to authorize the reclamation of mud flats and shoals, where that could be done without

detriment to the public rights. The filling up of such lands, it was said, was often an improvement of navigation, and an advantage to commerce, and therefore lands susceptible of reclamation by that method may be alienated irrevocably. This, in general terms, is the doctrine of the Chicago case, and of the numerous decisions therein reviewed and commented upon. It is also the doctine which has been distinctly announced by our predecessors in the former supreme court of this state. In *Ward v. Mulford*, 32 Cal. 372, Judge Sanderson says: "But by this we do not desire to be understood as holding that the Mexican government, or this state, has the same power of absolute alienation over lands held in virtue of their sovereignty which they have over other lands. The land which the state holds by virtue of her sovereignty, as is well understood, is such as is covered and uncovered by the flow and ebb of the neap or ordinary tides. Such land is held by the state in trust and for the benefit of the people. The right of the state is subservient to the public rights of navigation and fishery, and theoretically, at least, the state can make no disposition of them prejudicial to the right of the public to use them for the purposes of navigation and fishery; and, whatever disposition she does make of them, her grantee takes them upon the same terms upon which she holds them, and of course subject to the public right above mentioned. But this restriction does not prevent her from disposing of them so as to advance and promote the interests of navigation. On the contrary, such a disposition of them would be in keeping with the purposes of the trust in which she holds them. Nor of reclaiming them from the sea, where it can be done without prejudice to the public right of navigation, and applying them to other purposes and uses. There are large tracts of salt marsh lands, of which the land in suit is an example, which are covered and uncovered by the flow and ebb of the neap tides, and therefore belong to the state by virtue of her sovereignty, which are of no possible use for the purposes of navigation, but may be valuable for agricultural or other purposes if reclaimed from the tides. Such lands the state may undoubtedly grant in private ownership for the purposes of reclamation and use, for by such a course no right of the public to their use for the purposes of navigation would be prejudiced.

On the contrary, the right of navigation, in many cases, might be subserved by such reclamation."

The same doctrine is recognized in *Taylor v. Underhill*, 40 Cal. 471, and was even more distinctly stated in *Eldridge v. Cowell*, 4 Cal. 80. There is no decision of this court which conflicts in the slightest degree with the doctrine of these cases, each of which recognizes the fact that the submerged lands of the state, though held and owned subject to a public trust, are nevertheless alienable in private ownership where capable of reclamation without detriment to the public right, and *a fortiori* where their reclamation will be of advantage to navigation and commerce.

A grant by the state of California, therefore, of mud flats and shoals between high and low tide on the margin of the bay of San Francisco cannot be held to have been in excess of the legislative power, in the absence of any proof that such grant has seriously impaired the power of succeeding legislatures to regulate, protect, improve, or develop the public rights of navigation or fishery, and in this case it does not appear that the grant to Oakland, as here construed, would have that effect if transferred to a natural person or private corporation.

It is true that the private ownership of the shore may prevent access to the navigable waters of the bay, but so does the private ownership of the upland prevent access to the shore and to the navigable waters in the same sense and to the same extent. This, however, is a minor and temporary inconvenience for which our laws and the laws of all civilized states provide an ample remedy. By the exercise of the right of eminent domain all necessary means of access from the uplands to the waterfront may be condemned for the public use, at a cost not in excess of the reasonable value of the land taken or subjected to the servitude. And there is no injustice in requiring this compensation to be made to the grantee of shore lands when his right to such lands is in other respects valid in law; for, like other holders of title derived from the state, he is presumed to have given what, at the time of the grant, was deemed a fair equivalent for the land granted.

With this cursory review of the doctrine of the Chicago case, and of our own decisions, I take leave of the question of the

power of the legislature of California to have made a valid
grant of the land in controversy to Horace W. Carpentier or to
the Oakland Water Front Company, and address myself to the
more serious and difficult question, whether, in point of fact,
the grant to the town of Oakland has been transferred to those
parties, as claimed by the defendant, or has devolved upon and
has remained in the city of Oakland, as claimed by the plaintiff.

The original grant, as we have seen, was contained in the act
of incorporation of the town, the general features of which have
been already stated. It will now become necessary to consider
more particularly the specific terms and provisions of the act
for the purpose of ascertaining to what extent and subject to
what conditions the land so granted was alienable by the town
and its successor, the city of Oakland.

By section 2 of the act (Stats. 1852, p. 181), the corporate pow-
ers and duties of said town were vested in a board of five trus-
tees, and by section 3 it was enacted as follows:

"Sec. 3. The board of trustees shall have power to make such
by-laws and ordinances as they may deem proper and necessary;
to regulate, improve, sell, or otherwise dispose of the common
property; to prevent and extinguish fires; to lay out, make, open,
widen, regulate, and keep in repair all streets, roads, bridges,
ferries, public places and grounds, wharves, docks, piers, slips,
sewers, wells, and alleys, and to authorize the construction of the
same, and with a view to facilitate the construction of wharves
and other improvements, the lands lying within the limits
aforesaid, between high tide and ship channel, are hereby granted
and released to said town; provided, that said lands shall be re-
tained by said town as common property, or disposed of for the
purposes aforesaid; to regulate and collect wharfage and dock-
age; to secure the health, cleanliness, ornament, peace, and good
order of said town; to organize and support common schools;
to license and suppress dramshops, horseracing, gambling houses,
and houses of ill-fame, and all indecent or immoral practices,
shows, and amusements; to regulate the location of slaughter-
houses, stables, and places for the storage of gunpowder, and to
pass such other laws and ordinances as, in their opinion, the
order, good government, and general welfare of the town may
require."

This act of incorporation was approved May 4, 1852, and the town was immediately organized thereunder, Carpentier being elected one of the trustees, but failing to qualify.

On May 17, 1852, the board of trustees adopted the following ordinance:

"Section 1.   The exclusive right and privilege of constructing wharves, piers, and docks at any point within the corporate limits of the town of Oakland, with the right of collecting wharfage and dockage at such rates as he may deem reasonable, is hereby granted and confirmed unto Horace W. Carpentier and his legal representatives for the period of thirty-seven years; provided, that the said grantee, or his legal representatives, shall, within six months, provide a wharf at the foot of Main street at least twenty feet wide and extending toward deep water fifteen feet beyond the present wharf at the foot of said street; that he or they shall, within one year, construct a wharf at the foot of F street or G street extending out to boat channel; and, also, within twenty months another wharf at the foot of D street or E street; provided, that two per cent of the receipts for wharfage shall be payable to the town of Oakland.

"Sec. 2.   With a view the more speedily to carry out the intention and purposes of the act of the legislature, passed May fourth, one thousand eight hundred and fifty-two, entitled, 'An act to incorporate the town of Oakland and to provide for the construction of wharves thereat,' in which certain property is granted and released to the town of Oakland to facilitate the making of certain improvements; now, therefore, in consideration of the premises herein contained, and of a certain obligation made by said Horace W. Carpentier with the town of Oakland, in which he undertakes to build for said town a public schoolhouse, the waterfront of said town—that is to say, all the land lying within the limits of the town of Oakland between high tide and ship channel—as described in said act, together with all the right, title, and interest of the town of Oakland therein, is hereby sold, granted, and released unto the said Horace W. Carpentier, and to his assigns or legal representatives, with all the improvements, rights, and interests thereunto belonging.

"Sec. 3.   The president of the board of trustees is hereby charged with the duty of executing on behalf of the town of

Oakland a grant and conveyance in accordance with the provisions of this ordinance."

This was followed on May 31st by a deed of A. Marier, describing himself as president of the board of trustees of the town of Oakland, purporting to sell, transfer, grant, and release to Horace W. Carpentier, and his legal representatives, all the right, title, and interest of said town of Oakland in the land lying between high tide and ship channel within the corporate limits. This deed referred to the ordinance as authorizing it, and set forth the conditions subsequent upon which it was made, viz., the construction of the wharves, etc.

On December 30, 1852, another ordinance was adopted approving the wharf at the foot of Main street, and extending the time for completing the others.

On August 7, 1853, a third ordinance was adopted accepting another wharf and a schoolhouse, changing the site of the remaining wharves, and ratifying and confirming the ordinance cf May 17, 1852. It further provided that "the said waterfront of the town as therein described is hereby granted, sold, and conveyed unto said Carpentier and his legal representatives in fee simple forever, with the right to erect wharves, piers, docks, and buildings at any and all points thereon not obstructing navigation, and to freely use and occupy the lands herein conveyed."

Numerous questions of a highly technical character have been raised by counsel for respondent as to the nature of the estate vested in Carpentier by these proceedings, assuming them to have been valid. But back of all these questions, and more important than all, is the question as to the power of the trustees of Oakland to transfer to Carpentier the entire waterfront of the town. If it shall be held that they possessed no such power, a critical examination of the deed and ordinances for the purpose of determining their technical sufficiency to transfer a fee simple estate in the lands described will be wholly unnecessary.

It ought not to require any very elaborate discussion in order to show that the attempted transfer to Carpentier of the whole of the lands granted to the town for the purposes declared in the act of incorporation was absolutely void. The power of the legislature to make a grant of these lands to a natural person, and the power of the municipal corporation to make the grant,

are two very different things. The corporation had no power to alienate these lands unless such power was conferred by the legislature, and whether it was conferred or not is a question of legislative intent to be gathered from the terms of the statute construed with reference to its general scope and purpose. The purpose of the act was to create a municipal corporation composed of the inhabitants of a peninsula surrounded on three sides by the navigable waters of the bay of San Francisco. Considering the extent of territory included within the corporate boundaries, it is evident that a rapid growth of population was anticipated, and the situation of the town, with relation to the surrounding country and the most important harbor on the coast, no less than the express language of the title of the act, proves that one of the most important ends contemplated in the creation of the corporation was the improvement of commercial facilities by the erection of convenient wharves along its waterfront.

To carry this principal, and other minor, purposes into effect, the municipal corporation was created and invested with a share of the sovereign political power to be exercised within the local boundaries. The trust thereby imposed upon the municipal government was public, and could neither be delegated nor abdicated. But, by the proceedings above recited, there was an attempt to do both, by investing a private citizen with the exclusive right to erect wharves and regulate tolls. In this aspect of the ordinance it is confessedly void, but counsel for appellant strenuously contend that the grant of the land was valid, and rested upon a lawful and sufficient consideration. I do not think so. The ownership of the land was essential to the exercise of the power. That this was fully understood is shown not only by the provisions of the charter, but by all the proceedings of the town trustees. At every step the two things went together, and in their very nature it is apparent that the one was necessarily bound up in the other. For how was it possible for the town to erect wharves after parting with its entire waterfront? It could only have done so by repurchasing the necessary sites, and it is not to be supposed that the legislature intended so absurd a consequence.

Undoubtedly, it was the intention of the charter that the lands comprising the waterfront should be disposed of in some manner, but the manner of their disposition was to be consistent with the purpose of the grant. The town council was invested with power, among other things, to lay out streets, and the plain intent of the law was, that the streets of the town should be protracted to the waterfront, the intervening spaces divided into blocks and lots, and sold in subdivisions in such a manner as to preserve to the public ample means of access to the navigable waters of the bay and estuary, and to the municipal authorities ample space for the erection of wharves, piers, and docks. If any reasonable measures to this end had been taken, a sale of the lands by parcels would no doubt have been a proper exercise of power by the municipal authorities, but a transfer in bulk to a private citizen, without any reservation of the right of access to the navigable waters by which the town was almost completely surrounded, was a gross and evident excess of power.

Counsel for appellant have referred us to the numerous decisions affirming the validity of sales of the beach and water lots of San Francisco, but there is not the slightest similarity between the two cases. The grant to San Francisco was of the lots platted upon a survey showing streets extending to and along the permanent waterfront of the city, and authority to sell the lots was expressly conferred and was subject to no condition, express or implied, except the return of a percentage of the proceeds to the state. There was no other trust connected with the grant. The right of access to the waterfront, and of sites for wharves, etc., was secured in advance by a dedication of the streets connecting the upland with the ship channel, and covering its whole length. No power of the corporation was in the slightest degree impaired, and no right of the public infringed, by the sale of the lots bounded by these public highways. What had been done in San Francisco was indeed an example and a guide to Oakland in disposing of her waterfront, and I do not doubt that it was in contemplation of the legislature that substantially the same course should be pursued. Certain it is, at all events, that no such downright absurdity can be imputed to the legislature as an intention to vest the council with authority to cut the town off from access to the waterfront by

a transfer of the whole strip of shore lands at the same time that they were charged with the duty of erecting wharves, and when the construction of wharves was not only one of the declared purposes of the act, but was the express motive of the grant.

My conclusion upon this point is, the ordinances and deed of 1852-53, by which it was attempted to transfer the entire waterfront to Carpentier, were wholly void.

And no doubt this fact came to be well understood by Carpentier himself, for, as we shall see, he made various efforts from time to time to strengthen his title by legislative confirmation, purchases at execution sales, etc., and these are the matters to be next considered.

In the year 1854, as we have seen, the city of Oakland was incorporated as successor to the town, and with the same boundaries. Some time after its incorporation, it commenced a suit in equity to set aside the grant to Carpentier, on the ground of fraud, etc. A demurrer to the complaint was sustained, and the city declining to amend, judgment was entered in favor of defendants. On appeal to the supreme court, this judgment was reversed, and the cause remanded for further proceedings. (*Oakland v. Carpentier, supra.*) Before the case came to trial the second time the legislature passed the act of May 15, 1861 (Stats. 1861, p. 334), amending the charter of the city, which I have before cited in connection with the question of boundaries. This act, besides some trifling amendments relating to the rate of municipal taxes and the office of pound-keeper, attempted, as I have shown, to enlarge the grant of lands by giving a legislative construction to the original definition of the town boundaries, and, in addition thereto, amended section 12 of the act of 1854, by re-enacting it in these terms:

"Sec. 12. The corporation created by this act shall succeed to all the legal and equitable rights, claims, and privileges, and be subject to all the legal or equitable liabilities and obligations of the town of Oakland; and the ordinances of the board of trustees of said town are hereby ratified and confirmed, and the council shall have power to maintain suits in the proper courts to recover any right, or interest, or property, which may have accrued to the town of Oakland."

The amendment consisted in the insertion of the words "and the ordinances of the board of trustees of said town are hereby ratified and confirmed."

Upon the passage of this act Carpentier filed a supplemental answer in the case of *Oakland v. Carpentier, supra,* setting up the provisions of said section 12 as a legislative confirmation of his title, and when the case again went to the supreme court this point was very fully argued by counsel, but not decided by the court. (See · *Oakland v. Carpentier,* 21 Cal. 642.)

In the present case, however, it becomes necessary to decide whether, by this amendment to the charter of the city, Carpentier was invested with title to the waterfront.

It was, as has been shown, clearly within the power of the legislature to grant these lands to Carpentier, and the only question to be decided is, whether that was the intention of the law. If such was the intention, it cannot be denied that he then became vested with a perfect title.

But the law cannot be so construed. Up to this point Carpentier had no title—his asserted grant from the town being absolutely void, and, therefore, if this amendment to the city charter had the effect of investing him with complete title, it was substantially a new grant by the legislature. For it is to be remembered that the pretended grant by the town had been utterly repudiated by its successor, the city, which was at that very time endeavoring by its suit in equity to have its title to the waterfront judicially established. We are to suppose, then, that the legislature intervened in this controversy, and, over the head of the city, transferred by its fiat the whole of the waterfront to a private citizen; and not only that, but that it conferred upon him the exclusive right for more than a quarter of a century to erect wharves, and regulate tolls and wharfage for a growing and ambitious city. For a confirmation of the ordinance of May 17, 1852, not only transferred the land in controversy, but sanctioned the abdication by the municipal authorities of their governmental functions in respect to wharves and tolls.

Of course, it is impossible to suppose that the members of the legislature actually intended to bring about this result, and

the only question is, whether they have used language which compels a construction to that effect.

The argument of the appellant is, that the language of the amendment necessarily includes all the ordinances of the town, and along with the rest the ordinances making and confirming the grant. In other words, the contention is, that the word "ordinances," as here employed, is to be taken in its widest and most comprehensive sense. But there is a well-recognized rule of construction of statutes which requires the rejection of the broadest sense of a word, even when it is its most natural and usual sense, if that is necessary in order to give effect to the true intent of the law, or to prevent a result at variance with its apparent purpose. The word "ordinance," however, in its usual and primary sense, means a local law—a rule of conduct prospective in its operation, and applying generally to the persons and things subject to the local jurisdiction. It does not, in its ordinary use or signification, include a grant of lands. Conceding it to be true that a grant of lands may be made by municipal ordinance, it is equally true that the idea of such a grant is not suggested by the use of the word, and this because it is a very unusual mode of granting lands. It is to be presumed, therefore, that in this instance the legislature used the word in its ordinary and restricted sense, rather than in a sense which would bring about a result at variance with the purposes evinced by other portions of the act. The title to the act, and its declared purpose, was to amend the charter of the city of Oakland, and it did make some trifling amendments really germane to the subject. As an amendment it became part and parcel of the charter—which, like the original charter of the town, conferred the power and imposed the duty upon the municipal authorities to construct wharves and regulate tolls. Can it be supposed, then, that by the general words of this amendment the legislature intended to deprive the city of the means of executing the powers imposed upon it, or that it intended to make a grant to a private citizen without a precedent in the previous legislation of the state, and without a parallel in its subsequent legislation? While it is true that the legislature had the power to make the grant, they will not be held to have made it unless their intention so to do has been clearly manifested, and

here certainly such an intention is more than dubious. There was nothing in the title of the act to suggest the idea of a grant to Carpentier, and such a grant was in no degree germane to the avowed purpose of the act. On the contrary, it was, as we have seen, at variance with some of the most important provisions of the charter. For these reasons I conclude that the amendment ratifying and confirming the ordinances of the town of Oakland must be held to apply exclusively to ordinances properly so called —that is, to the local laws of the town, and not to ordinances which were mere grants or attempted grants of the lands of the corporation—to ordinances adopted in pursuance of the legislative authority of the council, and not to ordinances which were in effect mere conveyances or attempted conveyances of the property interest of the town in its waterfront lands.

The rule of construction upon which this conclusion is founded is stated and illustrated in sections 113, et seq., of Endlich on Interpretation of Statutes, where the authorities which support it are very fully cited.

In this connection I have not overlooked the case of *Thompson v. Thompson,* 52 Cal. 154, cited and relied on by appellant. But that case sustains the contention of counsel only to the extent that it holds or assumes that it is competent for the legislature to confirm or validate a void act of a municipal corporation. That the legislature has such power I have no doubt, but the question here is, whether it has attempted to exercise it to the extent claimed, and as to that matter *Thompson v. Thompson, supra,* is not in point, for the act there in question confirmed "all the acts and proceedings" of the trustees—a confirmation as comprehensive and universal as it could possibly be made. No construction of the language of that act could have excluded the transfer which it was held to have validated, and the transfer itself was of a character entirely consistent with the provisions of the charter.

It is to be regretted, I think, that a court should ever feel itself bound by rules of construction to give effect to statutes which ratify and confirm by wholesale the acts of municipal or other political agencies of the state. There is no more reckless or dangerous species of legislation. It is really legislating with the eyes shut, and under the mandatory and prohibitory provisions of

our present constitution is impossible. Under the old constitution, however, which, in respect to local and special legislation, titles of bills, etc., was construed to be merely directory, legislation of this character was possible, and ratifying laws passed while it was in existence, when clear and explicit, must be enforced, no matter how multifarious or incongruous may be the subjects which they embrace. They should, however, be closely scrutinized and strictly construed in order to prevent as far as possible the evils which they involve, and against which the framers of our present constitution have taken such strict and such necessary precautions.

The next contention of defendant is, that although Carpentier may have got no title by the ordinances of 1852-53 and the confirming act of 1861, still the final judgment of dismissal in the case of *Oakland v. Carpentier, supra,* estops the plaintiff upon the question of title.

The final judgment in that case was a dismissal in obedience to the mandate of the supreme court, and the opinion of that court (21 Cal. 667) shows that the validity of Carpentier's title was not determined. All that was determined was that the suit in equity could not be maintained, even if the grant to Carpentier was void. If it was void, the city could disregard it and assert her rights in any method appropriate to that state of the case.

The plaintiff is here pursuing the appropriate statutory remedy for establishing and enforcing her rights if the grant to Carpentier was void, and the judgment in *Oakland v. Carpentier, supra,* is no more an estoppel than the dismissal of a suit in equity upon the ground that there was a plain, speedy, and adequate remedy at law would be a bar to the appropriate action at law.

Defendant's claim of title, based upon the several execution sales of the waterfront under judgments against the town of Oakland, is the next point requiring notice. It is unnecessary to go into the details of these judgment and execution sales. A sufficient answer to all the claims based upon them is found in the conclusion above stated that the lands in controversy were held subject to the public trust of laying out streets through them to and along the waterfront, and of using them as sites for wharves, docks, piers, and other essential aids to commerce and to the

traffic of a seaport town. They were for this reason not subject to levy and sale under execution. (*Hart v. Burnett*, 15 Cal. 578.) The difference in the manner in which the waterfront of Oakland was held from that in which the beach and water lots of San Francisco were held has already been sufficiently stated, and demonstrates the inapplicability of the decisions—such as *Smith v. Morse*—holding that the water lots were the subject of execution sales.

The foregoing discussion brings us down in point of time to the year 1863, when the suit of *Oakland v. Carpentier, supra,* was finally dismissed, and results in the conclusion that Carpentier at that time had no title. The attempted transfer to him of the waterfront was void, and the city of Oakland was free to assert her rights by any action or other proceeding appropriate to that state of the case.

Carpentier, however, still asserted the validity of his title, and appears to have retained possession of such portions of the waterfront as he had found occasion to occupy by himself, his lessees and assignees.

In the year 1867, the authorities of Oakland again began to stir in the matter. A contract was made, or proposed, by which an attorney was retained for the purpose of recovering for the city the waterfront lands and the rights connected therewith. But before the commencement of any action or other proceeding for that purpose, a compromise of the claims of the city was proposed and accepted. At that time the transcontinental railroad was approaching completion, and the Western Pacific Railroad Company, which owned the franchise from Sacramento to San Jose, was projecting a branch line to a point on the bay at or near San Francisco. In order to induce that company to make its terminus at Oakland Carpentier offered them a portion of the waterfront claimed by him. They, however, had no confidence in the validity of his claim, and refused to consider his proposition unless the necessary steps should be taken to clear up his title. The whole matter was then submitted to the city authorities and their attorney, with the result that a compromise was agreed upon, and subsequently carried out. The substance of this agreement was that the city should procure from the legislature the necessary authority to make the compromise,

that a small portion of the waterfront should go to the city and the rest be divided between the Oakland Water Front Company— a corporation of which Carpentier was the principal stockholder —and the railroad company. The principal consideration to the city, and its principal share in the compromise, was the establishment of the railroad terminus at the city front and the expenditure of five hundred thousand dollars in the erection of depots and other terminal works.

In pursuance of an understanding to this effect, application was made to the legislature and an act was passed March 21, 1868 (Stats. 1868, p. 222), as follows:

"Section 1. The council of the city of Oakland, with the concurrence of the mayor of said city, is hereby authorized and empowered to compromise, settle, and adjust any and all claims, demands, controversies, and causes of action in which the said city is interested.

"Sec. 2. This act shall take effect immediately."

On March 31, 1868, all the parties interested, except the city, executed contracts in writing embodying the terms of the compromise, and on April 1st and 2d the following ordinances were duly adopted by the city council and approved by the mayor:

"The council of the city of Oakland do ordain as follows:

"Section 1. The claims, demands, controversies, disputes, litigations, and causes of action heretofore existing between the city of Oakland on the one part and Horace W. Carpentier and his assigns of the other part, relating to the force, validity, and effect of a certain ordinance passed by the board of trustees of the town of Oakland on the eighteenth day of May, A. D. 1852, and enrolled May 27, 1852, signed by A. Marier, president of the said board of trustees, and F. K. Shattuck, clerk of said board, entitled, 'An ordinance for the disposal of the waterfront belonging to the town of Oakland and to provide for the construction of wharves,' wherein and whereby, for the considerations therein named, 'the waterfront of said town, that is to say, all the lands lying within the limits of the town of Oakland and between high tide and ship's channel,' as described in the act of the legislature for the incorporation of said town, passed May 4, 1852, together with all the right, title, and interest of said town therein, together with all the privileges, rights, and franchises

therein mentioned, were sold, granted, and released to Horace W. Carpentier and his assigns.

"And also in relation to the validity, force, and effect of a certain conveyance, executed and delivered to the said Carpentier, of the said waterfront, dated May 31, 1852, by the said Amedee Marier, president of said board of trustees, under and in pursuance of said ordinance.

"And also in relation to the force, validity, and effect of a certain other ordinance passed by the board of trustees on the thirtieth day of December, A. D. 1852, entitled, 'An ordinance to improve the wharf at the foot of Main street, and to extend the time for construction of other wharves,' which said ordinance was enrolled January 1, A. D. 1853, and signed by said president and clerk of the said board of trustees, wherein and whereby the said first-mentioned ordinance and the said deed of conveyance were recognized and approved.

"And also in relation to the force, validity, and effect of a certain other ordinance entitled, 'An ordinance concerning wharves and the waterfront,' passed on the twenty-seventh day of August, A. D. 1853, by said board of trustees, which said ordinance was enrolled dated August 27, A. D. 1853, and was signed by A. W. Barrell, president, and A. D. Hurlbutt, clerk, of the said board of trustees, wherein and whereby the said first-mentioned ordinance was in all things ratified and confirmed and the said waterfront again granted, sold, and conveyed to the said Carpentier in fee simple forever—are hereby compromised, settled and adjusted, and the said above-mentioned ordinances and conveyances are made valid, binding, and ratified and confirmed, and all disputes, litigations, controversies, and claims in and to the franchises and property described in said ordinances and deed of conveyance, and every part thereof, are abandoned and released by the said city of Oakland to the said Carpentier and his assigns upon the following conditions, to wit, that the said Carpentier and his assigns shall convey by proper and sufficient deeds of conveyance all the property and franchises mentioned and described in said ordinances and deed of conveyance hereinbefore referred to, to the Oakland Water Front Company, to be used and applied in accordance with the terms, conditions, stipulations, ✳ and agreements, contained in certain contracts between the said

Oakland Water Front Company and the Western Pacific Railroad Company and other parties, bearing even date herewith, with the exceptions in the agreement specified. But nothing herein contained shall be deemed to affect any rights of the San Francisco and Oakland Railroad Company derived under an ordinance of the city of Oakland passed the twentieth day of November, 1861.

"Passed April 1, 1868.

"B. F. PENDLETON,

"President of the Council.

"Attest: H. Hillebrand, City Clerk.

"Approved April 1, A. D. 1868.

"SAM MERRITT,

"Mayor."

"The council of the city of Oakland do ordain as follows:

"An ordinance entitled an ordinance to amend an ordinance entitled 'An ordinance for the settlement of controversies and disputes concerning the waterfront of the city of Oakland, the franchises thereof, and other matters relating thereto.'

"Section 1. The third clause of section 1 shall be amended to read as follows: And also in relation to the force, validity, and effect of a certain other ordinance passed by the board of trustees on the thirtieth day of December, 1852, entitled 'An ordinance to approve the wharf at the foot of Main street and to extend the time for constructing the other wharves,' which said ordinance was enrolled January 1, 1853, and signed by the said president and clerk of the said board of trustees, wherein and whereby the said first-mentioned ordinance and the said deed of conveyance were recognized and approved.

"Passed April 2, 1868.

"B. F. PENDLETON,

"President of the Council.

"Approved April 2, A. D. 1868.

"SAM MERRITT,

"Mayor."

"The council of the city of Oakland do ordain as follows:

"Section 1. It appearing to the satisfaction of the council that all terms and conditions of a certain ordinance heretofore passed,

entitled 'An ordinance for the settlement of controversies and disputes concerning the waterfront of the city of Oakland, the franchises thereof and other matters relating thereto,' having been fully satisfied and complied with by Horace W. Carpentier and his assigns, all the ordinances and deeds therein mentioned and described are hereby finally ratified and confirmed, and all disputes, controversies, claims, demands, and causes of action heretofore existing between the city of Oakland on the one part and Horace W. Carpentier and his assigns of the other part, relating to the force and validity of the said ordinances and deed, are hereby abandoned and released by the said city of Oakland to the said Carpentier and his assigns; provided, that nothing herein contained shall release the right of the city of Oakland to the reversion of the property, franchises, and rights released, as provided in the contract between the Western Pacific Railroad Company and the Oakland Water Front Company, in case said city of Oakland shall become entitled to same under said contract.

"Passed April 2, A. D. 1868.

"B. F. PENDLETON,
"President Council.

"Approved April 2, 1868.

"SAM MERRITT, Mayor.

"Attest: H. Hillebrand, City Clerk."

I am utterly unable to see any reason for denying the efficacy of this compromise.

By the very terms of the act the council, with the concurrence of the mayor, was authorized to compromise, settle, and adjust any and all controversies in which the said city was interested. This is very different from the paraphrase "its controversies," which counsel for respondent use in their argument. There is some plausibility in the contention that authority merely to compromise "its controversies" would not enable the city to alienate property held subject to a public trust, but authority to compromise, settle, and adjust any controversy in which it was interested, conferred by the same power that created the trust, is certainly comprehensive enough to sustain a transfer of the property subject to the trust.

Nor is there anything in the suggestion that there was no existing controversy with Carpentier to be compromised.   If ever there was a flagrant and notorious controversy over anything, there certainly was such a controversy between Carpentier and the city of Oakland over this waterfront, and it was none the less a controversy because on the 21st of March, 1868, there was no action or legal proceeding actually pending in court.   As to the alleged unreasonableness of the compromise, it can only be said to have been unreasonable in the sense that the city gave up too much and kept too little.   But what the city should exact, or concede, in making the compromise was a matter confided to the discretion of the mayor and council, and, in the absence of fraud, their judgment is conclusive.

The conclusion, I think, necessarily follows that from and after the second day of April, 1868, the city of Oakland ceased to be the owner as trustee, or otherwise, of any portion of her waterfront except those portions secured to her by the compromise of that date, and such streets, thoroughfares, and other parcels as may have been previously dedicated to public use.   As to all such places the transfer to the Water Front Company and its assigns was subject to the public easement, and the city as trustee for the public is no doubt entitled to a decree in this action defining her right of control over the lands so dedicated.

With respect to such streets and public places, the various consent decrees, relied upon by defendant, constitute no estoppel, and the statute of limitations does not apply.

It results from what has been said that the judgment on both appeals and the order denying a new trial must be reversed, and the cause remanded for further proceedings in accordance with the views herein expressed.   It is accordingly so ordered.

Temple, J., and Van Fleet, J., concurred.

McFARLAND, J., concurring.—I concur in the judgment of reversal and in the conclusion reached in the opinion of the chief justice that the grant involved in this case, and the land claimed by the waterfront company is limited by the line of low tide on the westerly side, and on the estuary, and with respect to all other boundaries, by the lines designated in said opinion.   In that view the case at bar is not within the Chicago case; and

with respect to the general power of the state to dispose of her lands lying under navigable waters within her borders, I express no opinion. As thus limited there is no question as to the power. I think that title to the land in contest passed to the grantor of the waterfront company before the compromise of 1868—at least by the confirmatory legislative act of 1861. In other respects I concur in the opinion of the chief justice and in the directions given therein to the court below.

GAROUTTE, J., concurring.—I concur in the judgment of reversal. The grant in this case should be confined within the smallest limits possible. The state should have the benefit of all doubtful constructions in matter of description, and for this reason the westerly line of the grant should be established at the point of low tide. In this respect I agree with the conclusion of the chief justice.

There is no trust relation existing between the state and its people which prevents the disposition of its tide lands. The title to such lands is in the state as perfect, full, and complete as title to land can vest; and, in the absence of statutory or constitutional law to the contrary, the state has the power to part with such title. This power has always been recognized and exercised by the state. It is the settled policy of the state. Acting under it, the state has parted with tens of thousands of acres. Indeed, it may be said that all such lands have passed from the state to private ownership. If, by some principle of law not to be found in constitution or statute, a trust rests upon these lands in favor of the public, a trust which, like the burden that rested upon Sinbad, can never be shifted, then every grant of such land by the state in the past is void, and the whole theory upon which the state has acted in the disposition of these lands has been wrong. That such result necessarily follows is plain, for this trust, if there be one, is a trust for all time, and attaches to every rood of tide land in the state. If the power exists in the state to release a single square foot from its embrace, that power exists to release it all; for, when quantity is considered, it becomes a question of policy and not one of power. I am satisfied no trust ever rested upon the tide lands of this state which prevents an absolute disposition of them.

Conceding the power of the state to vest the absolute title to these lands in the town of Oakland, did the state exercise that power? It is now claimed by the city of Oakland that it held these lands in trust from the state, and that it was an act *ultra vires* upon its part to dispose of them to Carpentier. Conceding for present purposes the soundness of this contention, still the city has no prop to depend upon for support. This is so because the city of Oakland transferred the title to these lands to Carpentier by ordinance, and subsequently the state legislature, by act of 1861, ratified and confirmed "all the ordinances" of the town of Oakland. This ordinance answered to that description; it came within that class; and this court is bound to assume that the legislature meant what it said. The confirmation and ratification of this ordinance by the state legislature made the grant to Carpentier a legislative grant; and such grant for all purposes stood as a direct grant to him from the state. The views here expressed refer to tide lands not covered by navigable waters. As to lands under navigable waters I leave the question open.

HARRISON, J., dissenting.—I am unable to agree with the conclusion reached by a majority of the court. The plaintiff brought this action to quiet its title as against the defendant to certain lands lying below the line of ordinary high tide of the bay of San Francisco and the estuary of San Antonio, and within the boundaries of the city of Oakland, as defined in the act incorporating said city, April 24, 1862. The cause was tried by the court, and judgment rendered in favor of the plaintiff that as to the lands described in the complaint, with the exception of certain designated parcels described in the judgment, the title of the plaintiff is good and valid, and is vested in and held by it as a public corporation and governmental agency of the state of California for the common benefit of all the people of the state and the whole public; and that, as to certain parcels described in the judgment and which are found to have been filled in and raised above the level of ordinary natural high tide, the plaintiff has lost and the defendant has acquired the title in fee thereto, and the defendant's title thereto is good and valid; and also that the plaintiff is not the owner of that part of the land described in the complaint which lies southwardly from the present southern boundary line of the city of Oakland. A motion for a new

trial was made by the defendant and denied, and from the judgment in favor of the plaintiff and the order denying a new trial the defendant has appealed.

The town of Oakland was incorporated by an act of the legislature May 4, 1852 (Stats. 1852, p. 180), with the following boundaries: "On the northeast by a straight line at right angles with Main street, running from the bay of San Francisco on the north to the southerly line of the San Antonio creek or estuary, crossing Main street at a point three hundred and sixty rods northeasterly from 'Oakland House,' on the corner of Main and First streets, as represented on Portois' map of 'Contra Costa' on file in the office of the secretary of state; thence down the southerly line of said creek or slough to its mouth in the bay; thence to ship channel; thence northerly and easterly by the line of ship channel to a point where the same bisects the said northeastern boundary line."

Section 3 of the act incorporating the town declares: "The board of trustees shall have power to make such by-laws and ordinances as they may deem proper and necessary; to regulate, improve, sell, or otherwise dispose of the common property; to. prevent and extinguish fires; to lay out, make, open, widen, regulate, and keep in repair all streets, roads, bridges, ferries, public places, and grounds, wharves, docks, piers, slips, sewers, walls, and alleys, and to authorize the construction of the same, and, with a view to facilitate the construction of wharves and other improvements, the lands lying within the limits aforesaid, between high tide and ship channel, are hereby granted and released to said town; provided that said lands shall be retained by said town as common property, or disposed of for the purposes aforesaid; to regulate and collect wharfage and dockage, etc."

May 18, 1852, the trustees of the town of Oakland adopted an ordinance entitled "An ordinance for the disposal of the water-front belonging to the town of Oakland, and to provide for the construction of wharves." The ordinance is in the following terms:

"Section 1. The exclusive right and privilege of constructing wharves, piers, and docks at any points within the corporate limits of the town of Oakland, with the right of collecting wharfage and dockage at such rates as he may deem reasonable, is hereby

granted and confirmed unto Horace W. Carpentier, and his legal representatives, for the period of thirty-seven years; provided, that the said grantee or his representatives shall, within six months, provide a wharf at the foot of Main street at least twenty feet wide and extending toward deep water fifteen feet beyond the present wharf at the foot of said street.

"Sec. 2. With a view the more speedily to carry out the intentions and purposes of the act of the legislature passed May 4, 1852, entitled, 'An act to incorporate the town of Oakland, and to provide for the construction of certain wharves thereat,' in which certain property is granted and released to the town of Oakland to facilitate the making of certain improvements, now, therefore, in consideration of the premises herein contained, and of a certain obligation made by said Horace W. Carpentier with the town of Oakland in which he undertakes to build for said town a public schoolhouse, the waterfront of said town, that is to say, all the lands lying within the limits of the town of Oakland between high tide and ship channel, as described in said act, together with all the right, title, and interest of the town of Oakland therein, is hereby sold, granted, and released unto the said Horace W. Carpentier, and to his assigns or legal representatives, with all the improvements, rights, and interests thereunto belonging."

Section 3 provided for the execution of a conveyance of said lands to Carpentier by the president of the board of trustees. By virtue of this ordinance the president of the board of trustees, A. Marier, executed to Carpentier a conveyance of the land May 31, 1852. The interest thus conveyed to Carpentier became vested in the defendant herein prior to the commencement of this action, and the lands so conveyed to him are included within the description contained in the complaint herein.

The plaintiff was originally incorporated by an act of the legislature passed May 25, 1854 (Stats. 1854, p. 187), and succeeded to all the rights and claims of the town of Oakland in said lands; and was reincorporated in 1862 (Stats. 1862, p. 337), and was then empowered to maintain suits to recover any right or interest to property which may have accrued to the town and city of Oakland.

The court below held that the foregoing ordinance, and the deed of Marier purporting to sell and dispose of the lands therein described were null and void, and that said board of trustees had no right or power to pass said ordinance, and said Marier had no right or power to execute said instrument in pursuance thereof. The correctness of this finding underlies the decision of the court and the rights of the parties hereto, and has properly received the main consideration in the argument of counsel and by the court in determining the case.

The questions thus presented for determination are the nature or character of the tenure by which the state holds the title to the tide lands within its borders, and the effect of the act granting these lands to the town of Oakland, and also the interest in the land which was taken by Carpentier by virtue of the ordinance, as well as the effect of subsequent legislative acts and judicial proceedings.

1. The nature of the state's title to tide lands and lands covered by navigable waters, as well as the effect of a conveyance of these lands by a grant, either directly from the legislature or through legislative authority, has been the subject of frequent consideration by the courts, and many expressions are found in opinions given in deciding the cases in which the title is characterized as that of an absolute owner in fee. The cases in which the question has been considered have in nearly all instances, however, been those in which the right to the disputed lands was controverted by individuals claiming the same as against each other by virtue of conflicting grants or claims derived under the state, or when the rights of a grantee of the state were opposed to one claiming by prescription, or by virtue of a riparian claim, or to a claim alleged to be paramount or anterior to that of the state, and have arisen only where limited areas were involved. In these cases courts in determining the title of the grantee under the state have characterized the original title of the state thus conveyed to him as that of a sovereign with the full power of disposition; but, as was said by the supreme court of the United States in discussing this question in the Chicago case hereinafter cited: "General language sometimes found in opinions of the courts expressive of absolute ownership and con-

trol by the state of lands under navigable waters, irrespective of any tr    ? to their use and disposition, must be read and construed wr ?l reference to the special facts of the particular cases." In *Weber v. Harbor Commrs.*, 18 Wall. 57, the facts pertinent to the lands then in question did not require an investigation or determination of the nature of the state's title, but the court in its opinion declared that the state had "absolute property in and dominion and sovereignty over all soils under the tide waters within her limits, with the consequent right to dispose of the title to any part of said soils in such manner as she might deem proper, subject only to the paramount right of navigation over the waters, so far as such navigation might be required by the necessities of commerce with foreign nations, or among the several states." Similar expressions may be found in opinions in other cases, but in none of these cases prior to that of *Illinois Cent. R. R. Co. v. Illinois*, 146 U. S. 387, was the question directly presented as between the rights of the grantee and the rights of the public remaining in the granted lands, or the extent to which the state had the power to grant such lands, or whether there were any limitations upon the exercise of this power. In that case the state of Illinois had attempted to alienate certain lands beneath the waters of Lake Michigan, which included a large portion of the waterfront of Chicago, and the supreme court of the United States was for the first time called upon to consider the extent to which the right of the state to grant lands thus held for public use could be exercised without impairing the rights of those for whose benefit the trust existed, and in so doing pointed out more clearly than had been previously done the nature of this tenure, and that there are limitations upon the right of the state to dispose of such lands. In its opinion in that case it modified its previous declaration in *Weber v. Harbor Commrs.*, *supra*, of the state's power of disposition of such lands, by inserting the qualification "when that can be done without substantial impairment of the interest of the public in the waters."

The expressions found in many of the opinions, and repeated in the foregoing quotation from *Weber v. Harbor Commrs.*, *supra*, that the state holds the dominion and sovereignty over these lands, as well as the frequent statement that the state is sovereign, is apt to be misleading unless the proper significance of the

term "sovereign" when thus used is also considered. To the extent that the state is not subject to any superior control or authority it is sovereign, but it does not follow that it has absolute authority, or that its power of disposition over these lands is without limitation. Under the political system of this country the actual sovereign is the people, and all power of government and ownership of public property is vested in them, and is to be exercised solely for their benefit. The state is but the organized form of government which the people have established for their protection, both as individuals and as a body politic, with powers defined in a written constitution, and is sovereign only to the extent with which the people have invested it with their sovereignty. Being only a political entity, the powers and sovereignty thus conferred by the people must be exercised by individuals, and the exercise of the power under consideration has been intrusted to the legislature. The legislature is, however, only the agent and representative of the people, and holds the power and sovereignty conferred upon it in trust that they shall be exercised in the interest and for the benefit of its constituent, and subordinate to the trust under which they are held. As in the case of any other agent or trustee, an act done by it for the purpose and with the necessary result of injuring its principal, or of destroying the subject matter of the trust, even though done under the forms of the authority conferred upon it, will be held ineffective.

Whatever power or sovereignty has been conferred upon the state to be exercised only for the benefit and in the interest of the entire people, cannot be abdicated or surrendered to individuals, or exercised in favor of some to the detriment or disadvantage of others. The lands which the state holds in trust for the entire public are held by it in this limited sovereignty, and under the same trust as is the police power, or the power of taxation, or the right of eminent domain, and for the same reason are incapable of being placed beyond its control. Although the state is vested with the dominion and sovereign control of these lands, it does not follow that its power of disposition is the same as that of an individual over lands of which he holds the absolute fee, or that its tenure of the lands is identical with that of an individual owner. These lands are not held for the purposes of

sale, or for producing revenue or income therefrom, but are universally declared to be held for the use and benefit of the public, and the power of alienation, as well as the title of the state thereto, is limited by this trust under which they are held.   In *Illinois Cent. R. R. Co. v. Illinois, supra,* it was said that the title of the state to these lands "is a title different in character from that which the state holds in lands intended for sale.   It is different from the title which the United States hold in the public lands which are open to pre-emption and sale.   It is a title held in trust for the people of the state that they may enjoy the navigation of the waters, carry on commerce over them, and have liberty of fishing therein, freed from the obstruction or interference of private parties. . . . . The trust devolving upon the state for the public, and which can only be discharged by the management and control of property in which the public has an interest, cannot be relinquished by a transfer of the property.   The control of the state for the purposes of the trust can never be lost, except as to such parcels as are used in promoting the interests of the public therein, or can be disposed of without any substantial impairment of the public interest in the lands and waters remaining. . . . . The state can no more abdicate its trust over property in which the whole people are interested, like navigable waters and soils under them, so as to leave them entirely under the use and control of private parties, except in the instances of parcels mentioned for the improvement of the navigation and use of the waters, or when parcels can be disposed of without impairment of the public interest in what remains, than it can abdicate its police powers in the administration of government and the preservation of the peace.   In the administration of government, the use of such powers may for a limited period be delegated to a municipality or other body, but there always remains with the state the right to revoke those powers, and exercise them in a more direct manner, and one more conformable to its wishes.   So with trusts connected with public property, or property of a special character, like lands under navigable waters, they cannot be placed entirely beyond the direction and control of the state."

The question of the unlimited power of the legislature to grant these lands into private ownership may be fairly presented for

CXVIII. CAL.—14

consideration by assuming that that body could be induced to make a grant to an individual or to a corporation of all the tide lands and lands covered by navigable waters belonging to the state. Irrespective of the constitutional limitation in this state against gifts of public property, it would not be contended for a moment that such a grant could be sustained. "A grant of all the lands under the navigable waters of a state has never been adjudged to be within the legislative power; and any attempted grant of the kind would be held, if not absolutely void on its face, as subject to revocation." (*Illinois Cent. R. R. Co. v. Illinois, supra.*) It was said by the supreme court of New Jersey in *Arnold v. Mundy*, 6 N. J. L. 1, 10 Am. Dec. 356: "The sovereign power itself cannot, consistently with the principles of the law of nature and the constitution of a well-ordered society, make a direct and absolute grant of the waters of the state divesting all the citizens of their common right. It would be a grievance which never could be long borne by a free people." A grant to an individual of all of the land covered by the Sacramento river, or lying within the ebb and flow of the tide thereon, would manifestly be beyond the power of the legislature; but a grant of the entire waterfront of a municipality, by which all ingress and egress between the upland and the navigable waters bordering thereon is cut off or placed at the arbitrary will of an individual, differs only in degree from a grant of the bed of the Sacramento river or of the waterfront of the entire state. It was shown by testimony in the present case that the distance from the line of ordinary high tide to ship channel, measured along the northeasterly boundary of the town of Oakland, as defined in the act of 1852, is upward of five miles, and that, by reason of the diverging lines of its north and south boundaries, the tract of land between the line of high tide and ship channel is in the shape of a fan, widening as it extends into the bay, so that the frontage at the line of ship channel is about seven miles. The court found as one of the facts herein: "The length of the shore line of the tract of land described in the complaint, measured on the line of ordinary natural high tide, is thirteen and fifty-six hundredths miles; the length of its frontage upon the channel lines is thirteen miles, and the area of said tract of land is about seven thousand eight hundred and seventy acres."

It neither needs nor admits of argument or evidence to make it manifest that the state cannot make a grant of this extent without "a substantial impairment of the interest of the public in the waters" covered by the grant, as well as those bordering thereon.   That a waterfront may be available to the public it must be capable of approach from both sides, from the water to the land, as well as from the land to the water; but by the terms of this grant there is drawn in front of the entire upland a cordon of land miles in width, making ingress and egress between the land and the water impossible, except at the will of the grantee. If the state had the power to authorize this grant, it could authorize similar grants by every municipality, and could organize municipalities by which the entire water frontage of the state would be occupied.   If the state can irrevocably part with its dominion over the entire waterfront of Oakland, it can do so with the entire waterfront of any and every municipality within its borders, and it is only necessary to conceive of similar grants to Alameda, Berkeley, San Pablo, and other towns bordering upon the bay and elsewhere, in order to see the state deprived of its entire sovereignty and control over these lands, as fully as though they had all been granted by a single legislative act.   No instance has been cited of a grant approximating in extent the one under consideration, and we do not hesitate to say that no court has ever sustained the validity of a grant of this extent.

The principles thus declared do not, however, prevent the state from conveying by its grant an absolute fee to parcels of these lands, and the cases in which such grants have been upheld illustrate the extent to which the grants may be made, as well as their limitations.   As one of the main purposes of the trust under which they are held is that the public may enjoy them for the benefits of commerce and navigation to be derived therefrom, the state, as the organized representative of the public, may, in its administration of that trust, find it to be for the advantage of the public, and in promotion of the purposes of the trust, as well as to secure the benefits of navigation and commerce, to construct docks, wharves, piers, or basins upon the lands covered by these waters, and for that purpose may authorize their construction by others, and may part with the title to the land upon which they are constructed.   It was said in the Chicago case:

"The interest of the people in the navigation of the waters and in commerce over them may be improved in many instances by the erection of wharves, docks, and piers therein, for which purposes the state may grant parcels of the submerged lands, and, so long as their disposition is made for such purpose, no valid objections can be made to the grants." And in the same case the court further said that the grants that have been considered and sustained in the adjudged cases as a valid exercise of legislative power have been "grants of parcels of lands under navigable waters, that may afford foundation for wharves, piers, docks, and other structures in aid of commerce, and grants of parcels which, being occupied, do not substantially impair the public interest in the lands and waters remaining"; and that "it is only by observing the distinction between a grant of such parcels for the improvement of the public interest, or which when occupied do not substantially impair the public interest in the lands and waters remaining, and a grant of the whole property in which the public is interested, that the language of the adjudged cases can be reconciled." The grant of a parcel of land which may serve as the foundation for a wharf or a pier, and which is actually used for such purpose, would be within the direct purposes of the trust for which the lands are held by the state; and it may also be conceded that if lands covered with water are granted by the state, and are afterward reclaimed and occupied for purposes not connected with commerce and navigation, but in such a way as not to impair the rights of the public in the waters still remaining, leaving them open to free access from the upland, the state would not be at liberty to recall the grant. This is, however, an entirely different proposition from a grant of the entire waterfront of a city or township, either as a donation or upon the consideration of constructing a single wharf thereon, or the construction of some public improvement disconnected with the use of the lands.

The state cannot part with the control of these lands for other public uses than those for which they are held, or than such as will promote the interests of the public in navigation and commerce, and is precluded from alienating them for other purposes. The same considerations which prevent it from making a donation of them to an individ-

ual for his own private purposes preclude it from alienating them for other public purposes than those for which they are held in trust. "The trust for which they are held is governmental, and cannot be alienated except in those instances mentioned of parcels used in the improvement of the interest thus held, or when parcels can be disposed of without detriment to the public interest in the lands and waters remaining." (*Illinois Cent. R. R. Co. v. Illinois, supra.*) The legislature can no more extinguish or destroy the right of the public in these lands by exchanging them for lands or property to be used for other public purposes than it can by alienating them *in solido* by a legislative grant. Whether the state may appropriate the moneys it shall receive for such portions as it may lawfully sell to other public purposes need not be considered, nor is it necessary to consider the extent of the parcels which it may dispose of, or whether the judgment of the legislature as to the extent of such disposition is final. A grant by the legislature is the act of a co-ordinate branch of the government, and, so long as its right to make the grant is an open question, the judiciary are not justified in refusing to give it effect. (*Madera Irrigation Bonds,* 92 Cal. 310; 27 Am. St. Rep. 106.) If a contest upon this question is presented to the courts, they would be authorized to determine it to the same extent as they are authorized to determine whether the purpose for which taxation or the right of eminent domain is authorized is a public purpose, or whether the use for which private property is taken in any particular instance is a public use. If the exercise of this power in any given case lies upon the border line, or is equally susceptible of a construction in favor of as against its validity, courts will respect the determination of that branch of the government and refuse to question its exercise; but if it is apparent from the terms of the grant itself that it is in excess of the power of the legislature, or is in violation of the trust upon which the lands are held by the state, courts will no more hesitate to pronounce the grant invalid than to declare any other act of the legislature without effect that has been passed without authority. If the grant be of an entire harbor, or if it purports to grant in a single tract all the land forming the water approaches to a basin or city, there can be no question of its invalidity.

The fact that at the time of the passage of the act and the grant thereunder Oakland had but a fraction of the population which it now possesses, or that the value of the land granted was small, is immaterial and a false quantity in determining the power of the legislature. The trust under which the lands were held was not limited to that date, but extended throughout the existence of the state for all time, and the lands were held for future generations as well as for those then capable of enjoying them. In the Chicago case, the grant was of only a portion of the lake front and extending nearly a mile out into the lake. At the time when it was made the population of the city was not one-fourth what it was when the decision thereon was rendered, and when the validity of the grant came before the courts for determination the city had extended for miles further south, but it was not contended that these facts in any respect affected the validity of the grant or the power of the legislature at the time it was made.

Neither is the right of the defendant in these lands increased by the fact that other tracts of land of great extent have been conveyed by the state. The facts connected with those grants are not before us, and we would not be justified in expressing an opinion upon their validity. The grant to San Francisco by the act of March 26, 1851 (Stats. 1851, p. 307), is peculiarly within the conceded right of the state to dispose of these lands in parcels for the purpose of promoting the interests of commerce and navigation. The land which was granted by that act was that which was situate within certain boundaries, "according to the survey of the city of San Francisco, and the map or plat of the same now on record in the office of the recorder of the county of San Francisco." The land within these boundaries had been laid out into lots and blocks, with streets intersecting the blocks, and also along the waterfront and extending therefrom to the upland, and in the act itself these lots were designated as "the San Francisco beach and water lots." The map had been drawn in accordance with a survey made in 1847 by virtue of the directions of General Kearny, and the beach and water lots designated thereon, each with an area of one-third of a fifty vara lot, and seven hundred and seventy-two in number, had been sold at public auction under the direction of the ayuntamiento

prior to the incorporation of the city, and at the passage of the act were claimed in private ownership, and the grant to the city was for the purpose of releasing to these grantees the right of the state therein, and of confirming their claim thereto. (See *Eldridge v. Cowell*, 4 Cal. 80.) The grant to the city was of the use and occupation of the land for a limited period, with the right to dispose of the same, and providing that the title thus conferred should inure to the benefit of her previous grantees. Section 4 of the same act provided that the boundary line described in the first section of the act should be and remain a permanent waterfront of said city, and that the authorities of the city should keep the space beyond said line, to the distance of five hundred yards therefrom, clear and free from all obstructions whatsoever; and, as if to emphasize the purpose of the state not to part with its control over the waters, it was declared in section 6: "Nothing in this act shall be construed as a surrender by the state of its right to regulate the construction of wharves or other improvements so that they shall not interfere with the shipping and commercial interests of the bay and harbor of San Francisco." At the same session of the legislature another act was passed (Stats. 1851, p. 311), by which the city of San Francisco was authorized "to construct wharves at the ends of all streets commencing at the bay of San Francisco, the wharves to be made by the extension of said streets into the bay in their present direction, not exceeding two hundred yards beyond the present outside line of the beach and water lots, and to prescribe the rates of wharfage that shall be collected on said wharves when constructed. The space between said wharves when they are extended, which is situated outside of the outer line of beach and water lot property, as defined by the legislature, shall remain free from obstructions and be used as public slips for the accommodation and benefit of the general commerce of the city and state." When the state afterward authorized the disposition of its reversion in the property thus granted to the city, it directed that the property be sold "by lots as the same are now laid out on the official map of said city, and, where none such are so laid out, then in such lots as may be laid out by the board in conformity with the said official map." (Stats. 1853, p. 219.)

The state does not violate the trust under which it holds the title to these lands by designating a waterfront at a line within a reasonable distance from the line of high tide, and at the same time providing for the construction of wharves and piers at that line, since this is in the direct interests of commerce and navigation and is also in execution of said trust. Whether such waterfront should be at the line of high or low tide, or at a point below that, would depend upon the conformation of the shore and the distance between it and deep water. Upon the designation of the line of such waterfront, and providing means of access thereto from the upland sufficient to meet the present and prospective necessities of commerce, the lands within this line not so reserved would cease to be subject to the trust upon which they were previously held, and the state could either reclaim them itself, or it could dispose of them as freely as it can of any other lands held by it merely in its proprietary right. The principle, however, under which such action by the state is upheld, is entirely inconsistent with a grant by it of the entire space between the line of high tide and ship channel in which no line is designated for a waterfront, or provision made for access to the waters from the upland, or for the construction of wharves at any point within the granted lands, and in which no obligation is imposed, upon the grantee to construct any wharves therein or to make any provision for the necessities of commerce and navigation.

It follows, therefore, that by the act of 1852 the legislature did not confer upon the town of Oakland the title in fee to the lands within its limits then lying below the line of high tide, or the right to dispose of the same as an entirety or by a single grant, and that the ordinance passed by the town granting the said lands to Carpentier, as well as the conveyance executed to him by Marier in pursuance thereof, were invalid to vest in Carpentier any title to said lands or to any part thereof. The legislature could not give to the town of Oakland any greater power to alienate or dispose of these lands than was possessed by itself, and the grant by the town to Carpentier must be regarded as taken by him with full notice of the limitations upon the power of the legislature, and with the same effect as if it had been made directly to him by the legislature itself in the terms of the act.

2. The defendant, in a separate answer to the complaint, pleaded that by reason of a judgment rendered in a former action between its predecessor and the plaintiff, the plaintiff is estopped from maintaining the present action. The facts upon which the alleged estoppel rests are as follows: In 1857 the plaintiff herein commenced an action against Carpentier for the purpose of having the aforesaid ordinance and grant adjudged to be null and void, alleging in its complaint that by the act of 1854 it had succeeded to the rights of the town of Oakland; that by virtue of the act of 1852, incorporating the town of Oakland, a grant was made to the town of the lands described in that act; that by the second section of the act the corporate powers of the town were to be exercised by a board of five trustees; that, although five trustees were elected, only four qualified and acted; that at a meeting of these four a resolution was passed by which they pretended to convey to Carpentier "the exclusive right and privilege of constructing wharves, piers, and docks at any point within the corporate limits of the town of Oakland, with the right of collecting wharfage and dockage as he might deem reasonable, upon certain conditions in said ordinance particularly set forth"; that "by the same pretended ordinance, and for the considerations therein set forth, a pretended grant was made to the said Carpentier of all the improvements, rights, and interests belonging to the said town, and to the lands lying within the limits of the town of Oakland"; and that thereafter the president of the board of trustees made a conveyance in pursuance of said ordinance, which purported to convey to Carpentier the exclusive right and privilege of constructing wharves and collecting wharfage for the period of thirty-seven years," together with all the right, title, and interest of the town of Oakland in and to the waterfront of said town, and situated between high tide and ship channel, as granted to said town and as described in said last-mentioned act of the fourth day of May, 1852, upon the conditions and for the considerations set out in said deed." The plaintiff in said action therefore charged that "the said corporation was not, at the time of the passage of the said ordinances, lawfully constituted under the provisions of the said act, and that all the actings and doings purporting to be the acts of said corporation, including the said pretended

ordinances and deed made in pursuance thereof, are absolutely null and void, and confer no rights on said pretended grantee"; "that the said pretended deed of the twenty-seventh day of May, 1852, to said corporation is void and of no effect, because it is not made under the seal of the said corporation"; that "the exclusive right to collect wharfage and dockage was a franchise conferred upon said corporation by the legislature for the use and benefit of all the inhabitants of said town, and as such it had no power or authority under the act of incorporation to alienate or transfer the same." It was further alleged that Carpentier had acted fraudulently in procuring the said pretended grant, and in procuring other grants and ordinances, and the various particulars in which the fraud was charged were set forth in said complaint, and the plaintiff therefore charged "that the above-mentioned ordinances and deeds constitute a cloud on the title of the plaintiff, and embarrasses the city in the exercise of the legitimate functions appertaining thereto"; and prayed "that the said pretended ordinances and deeds may be declared null and void and of no effect, and that the defendant be directed to deliver up to the plaintiff the property pretended to be conveyed by said deeds and ordinances." To this complaint the defendants answered, denying the averments in the complaint with reference to the incorporation of the town of Oakland, and denying that the actings and doings purporting to be the acts of said corporation, or any of them, were null and void, or conferred no rights upon Carpentier, or that the deed from the corporation to him was void or of no effect, or that the exclusive right to construct wharves, with the exclusive right to collect wharfage, was a franchise which the corporation had no power to alienate and transfer; and also denied "that the said ordinances and deeds in the said complaint mentioned, or any of them, constitute a cloud on the title of the plaintiff, or embarrasses the city in the exercise of the legitimate functions appertaining thereto, or in any other manner." The defendant also denied the several allegations of fraud charged in the complaint, and, in addition to these denials, affirmatively alleged the incorporation of the town, the election of its trustees, their organization and adoption of the ordinance granting the land to Carpentier, setting forth the ordinance at length, the conveyance thereof to him by

the president of the board, the acceptance of the grant by him, and the agreement on his part to perform the conditions therein imposed, and his subsequent performance thereof, and that by reason thereof he had become vested with the title to the lands in question, and that the plaintiff was estopped from maintaining its said action.

The cause was tried by the court and judgment rendered in favor of the plaintiff. From this judgment an appeal was taken to the supreme court, and the judgment of the trial court was reversed by that court, and the district court was directed to dismiss the suit. (*Oakland v. Carpentier,* 21 Cal. 642.) In its opinion rendered upon deciding the appeal, the supreme court, after reciting the facts in the case, said: "The suit is, of course, for equitable relief, and the grounds alleged for the interposition of equity are that the grant or conveyance was obtained by fraud on the part of Carpentier, and was made without authority on the part of the trustees, and that it constitutes a cloud upon the title of the city, and embarrasses her in the exercise of her legitimate functions"; and, after stating that the charges of fraud were not entitled to consideration by reason of their vague and indefinite character, as well as by the fact that they were fully denied and wholly unsustained by the proofs, the court further said: "Stripped of the charges of fraud, the whole claim for equitable relief falls to the ground. The grant was either valid, or void or voidable. If void, as contended by the counsel for the respondent, there can be no occasion for the interference of a court of equity. If void, the condition of things—of the rights, privileges, and estate of the city—remains as though no transfer had been attempted. No cloud is cast upon her title, and no embarrassment can attend the exercise of her legitimate functions. She has only to proceed and assert her privileges and claim her interests, and whoever interferes with them will be a trespasser. If, however, the grant is only voidable, and not void, the plaintiff seeking the aid of a court of equity can only obtain equity by doing equity—that is, she can only obtain relief from the acts of the agents of the town by tendering compensation to the defendant, who has relied upon them for his expenditures. . . . . The conclusion which follows from the views we have expressed is evident. The charges of fraud as a ground

for the equitable interposition of the court are fully answered, and must be left out of the case. If the ordinances of the board granting the franchises and lands to Carpentier are void, there is no occasion for the interposition of equity. If they are only voidable, that interference cannot be invoked until equity is done by the plaintiff claiming it—that is, by placing or offering to place the party relying upon the acts of the agents of the town in the same position which he would have occupied but for his reliance upon their validity. These views dispose of the case and render it unnecessary to consider the other points made by the appellants. The judgment of the court below must therefore be reversed, and that court directed to dismiss the suit; and it is so ordered." Upon the filing of the *remittitur* in the district court, that court, in accordance with the directions of the supreme court, entered a judgment "that the judgment heretofore entered herein in favor of the plaintiffs, and against the defendants, be and the same is hereby in all things reversed, and that this action be and the same is hereby dismissed."

The doctrine of *res judicata,* or estoppel by reason of a former judgment, rests upon the principle that a cause of action which has been once determined upon its merits by a competent tribunal, between parties over whom that tribunal had jurisdiction, cannot afterward be litigated by them in another proceeding, either in the same or a different tribunal, and it is immaterial whether such cause of action is of equitable or of legal cognizance, or whether the judgment was given in a common-law court or was rendered by a court of equity; the effect of a final judgment in either tribunal is the same. But, if the judgment in either tribunal is rendered for a reason or upon a ground not involving the merits of the controversy, no such effect can result. The form of the judgment is immaterial, but unless it appears from the record that it was given upon a consideration of the merits of the controversy, or if it affirmatively appears that the merits were not considered, it is not available as an estoppel. By section 1908, subdivision 2, of the Code of Civil Procedure, the effect of a judgment is conclusive "in respect to the matter directly adjudged," and by section 1911 "that only is deemed to have been adjudged in a former action which appears upon its face to have been so adjudged, or which was actu-

ally and necessarily included therein or necessary thereto." Certainty is an essential element of every estoppel, and, in the case of a judgment, unless this certainty appear upon the face of the record, the record of the judgment will not constitute an estoppel. When various grounds of defense are set forth in the answer to the complaint, some of which relate merely to the form of the action, or to the manner in which the suit is brought, and the others to the merits, and the judgment is in general terms without indicating the grounds upon which it is based, it cannot be held to preclude the parties from again entering upon an examination of the merits of the controversy. The distinction sometimes attributed to the effect of a judgment in a common-law action from that rendered in a suit in equity is due chiefly to the mode of procedure, since in either case this effect is only that of an estoppel, and the estoppel can extend only to the matter adjudged. In jurisdictions where actions at law and suits in equity were conducted in different tribunals, the forms of procedure peculiar to each were observed by the respective tribunals, and a judgment dismissing a complaint was ordinarily treated as a final judgment on the merits. This distinction arose from the different mode of presenting the cause of action to the court. In a bill in equity the complaint ordinarily set forth the facts out of which the equity arose, corresponding to the evidence presented at the trial of an action at law, and the judgment of the court was invoked upon the sufficiency of these facts to entitle the plaintiff to the relief he asked, while in an action at law the plaintiff made his demand for damages in general terms, leaving the right to their recovery to be determined by the proof which he might make at the trial. A "nonsuit" was not recognized in equity practice, but was peculiar to common-law practice, and was given only at the instance or with the consent of the plaintiff. In equity, however, the dismissal of a bill had in many instances the same effect as a nonsuit, and by section 581 of the Code of Civil Procedure, involuntary nonsuits are allowed in this state, and the two steps in procedure in the trial of a cause are made equivalent to each other. That section declares that in certain instances "an action may be dismissed, or a judgment of nonsuit entered," making the two proceedings equivalent to each other, and without any distinction between

their effect. (*Coit v. Beard*, 33 Barb. 357; *Wheeler v. Ruckman*, 51 N. Y. 391.) In this state there is but one form of civil action, and the rules of procedure are applicable alike to all actions. A judgment of nonsuit may be entered in a suit in equity, or a common-law action may be dismissed, with the like effect in each. The judgment is entitled to no greater consideration from the mere fact that by its terms it is given upon a dismissal of the action at the instance of the court, than if it were merely a judgment of nonsuit at the instance of the plaintiff. Whenever such judgment is relied upon as a bar to another action, or is offered in evidence as an estoppel, it must appear that it necessarily involved a determination of the fact sought to be established by the second action. The dismissal of a bill in equity upon the ground or for the reason that the plaintiff has an adequate remedy at law is not a judgment upon the merits of the controversy, and, if it appear from the record that the dismissal may have been upon that ground, it will not be held that the merits were considered by the court, or that the judgment is a bar to another action. In order that the judgment may be a bar, it must affirmatively appear that it was not made upon this ground. In *Foote v. Gibbs*, 1 Gray, 412, Chief Justice Shaw said: "If a court does not take jurisdiction of a suit in equity, but dismisses the bill because the plaintiff has an adequate remedy at law, or for want of prosecution, or otherwise for some cause not embracing an adjudication on the merits, such dismissal is not a bar." In *Hughes v. United States*, 4 Wall. 232, the supreme court said: "In order that a judgment may constitute a bar to another suit, it must be rendered in a proceeding between the same parties or their privies, and the point of controversy must be the same in both cases, and must be determined on its merits. If the first suit was dismissed for defect of pleadings or parties, or a misconception of the form of proceeding, or the want of jurisdiction, or was disposed of on any ground which did not go to the merits of the action, the judgment rendered will prove no bar to another suit." In *Smith v. Auld*, 31 Kan. 262, the court had refused to enter upon a consideration of the merits, and had thereupon dismissed the action, and it was held that such dismissal was not a bar to another action, saying, after quoting various authorities to this effect:

"We think it fairly follows from these authorities that the mere fact that the dismissal is not expressed to be without prejudice does not necessarily establish that it was a decision on the merits, and therefore a bar to a subsequent action." In *Foster v. "The Richard Busteed,"* 100 Mass. 409, 1 Am. Rep. 125, the rule is stated as follows: "To be a bar to future proceedings, it must appear that the former judgment necessarily involved the determination of the same fact, to prove or disprove which it is pleaded or introduced in evidence. It is not enough that the question was one of the issues in the former suit. It must also appear to have been precisely determined." And to the suggestion that in equity the dismissal of a bill imported that the dismissal was on its merits, and therefore a bar to future proceedings, the court said: "There is no essential difference between the effect of a decree in equity and of a common-law judgment in this respect. A bill regularly dismissed upon the merits, where the matter has been passed upon and the dismissal is not without prejudice, is a bar to future proceedings either in equity or at law, and under similar circumstances a judgment at law is a bar to future proceedings in equity. But no such effect is attributable to a decree dismissing a bill for want of jurisdiction, failure of prosecution, want of parties, or any other cause not involving the essential merits of the controversy. And where in the answer various matters of defense are set forth, some of which relate only to the maintenance of the suit and others to the merits, and there is a general decree of bill dismissed, from which it does not appear what was the prevailing ground of defense, it is impossible to hold that the decree operates to preclude future proceedings." In *Butchers' etc. Assn. v. Boston*, 137 Mass. 186, the court said: "If a bill is dismissed for some cause not involving an adjudication upon the merits, such as that the plaintiff has an adequate remedy at law, such dismissal is not a bar to a suit at law. If the record does not show for what cause the bill is dismissed, resort may be had to extrinsic evidence to show this." In *Russell v. Place*, 94 U. S. 606, it was said: "It is undoubtedly settled law that a judgment of a court of competent jurisdiction, upon a question directly involved in one suit, is conclusive as to that question in another suit between the same parties. But to this operation of the judgment it must

appear, either upon the face of the record or be shown by extrinsic evidence, that the precise question was raised and determined in the former suit. If there be any uncertainty on this head in the record, as, for example, if it appear that several distinct matters may have been litigated, upon one or more of which the judgment may have passed, without indicating which of them was thus litigated and upon which the judgment was rendered, the whole subject matter of the action will be at large and open to a new contention, unless this uncertainty be removed by extrinsic evidence showing the precise point involved and determined. If, upon the face of a record, anything is left to conjecture as to what was necessarily involved and decided, there is no estoppel in it when pleaded, and nothing conclusive in it when offered as evidence." (See, also, *Baird v. Bardwell,* 60 Miss. 164; *Aiken v. Peck,* 22 Vt. 260; *Lessee v. Truman,* 10 Ohio St. 45; 1 Greenleaf on Evidence, sec. 530; Story's Equity Pleading, sec. 793, and cases cited in note *a;* 1 Daniell's Chancery Practice, 659, note b; Bigelow on Estoppel, 58.)

Section 581 of the Code of Civil Procedure provides that an action may be dismissed or a judgment of nonsuit entered in several enumerated instances, and in section 582 it is declared: "In every case other than those mentioned in the last section, judgment must be rendered on the merits." It is contended on the part of the defendant that, as it does not appear that the judgment in the case of *Oakland v. Carpentier, supra,* was rendered under any of the provisions of section 581, it was of necessity rendered upon the merits. Section 582 is, however, the declaration of a rule of procedure, rather than a principle of law. It is not the fact that every judgment that is not rendered under the provisions of section 581 is rendered upon the merits. Section 430 of the Code of Civil Procedure specifies various grounds upon which a demurrer to the complaint may be made, and if, upon sustaining such demurrer the complaint is not amended, judgment will then be entered in favor of the defendant. If such judgment is entered for want of jurisdiction in the court, or for defect of parties, or for ambiguity in the statement of the cause of action, it would be neither under the provisions of section 581 nor upon the merits." "A judgment upon the merits is one which determines either

upon an issue of law or fact which party is right" (*Rosenthal v. McMann*, 93 Cal. 509), but the merits of the issue presented upon the facts is a matter entirely different from the merits of the issue presented upon the law.

Under the foregoing principles it must be held that the plaintiff is not estopped from maintaining the present action by reason of the judgment dismissing the suit in the action of *Oakland v. Carpentier, supra.* The judgment that was finally entered in the district court in that action was the judgment of the supreme court, and was not rendered by reason of any consideration of the merits of the controversy by the district court, and can, therefore, be invoked as an estoppel only as to those matters which were determined by the supreme court and made the basis of its direction to the district court. That court did not purport to make its decision upon a consideration of the merits of the controversy, nor can it be determined from its opinion whether it directed the dismissal upon the ground that the plaintiff had an adequate remedy at law, or upon the ground that its complaint did not state sufficient grounds to entitle it to invoke the particular aid of equity which it sought. The element of certainty, so essential in every estoppel, is wanting. Lord Coke says (Coke on Littleton, 352 b): "Every estoppel must be certain to every intent, and not to be taken by argument or inference"; but only by either inference or argument can it be determined upon what ground that court directed that the suit be dismissed. It did not determine whether the grant to Carpentier was valid or void; but we have the right to assume that, if it had been required to make a decision thereon, it would have decided in accordance with the conclusion reached by us in the former part of this opinion, that the act of May 4, 1852, gave to the town of Oakland no authority to make the grant to Carpentier.

3. February 19, 1880, the plaintiff herein commenced an action in the superior court for the county of Alameda against the defendant herein and others to quiet its title to the lands involved in this action, and to obtain a judgment that it held the said lands as successor of the state of California by a good and sufficient title in trust for the use and benefit of the public. Issues were joined therein by the several defendants, and, in

addition thereto, the defendant herein filed a cross-complaint against the plaintiff alleging ownership of a portion of the lands, and asking a judgment quieting its title thereto. No answer to this cross-complaint was filed by the plaintiff. While the action was pending the city council of Oakland, January 12, 1882, adopted an ordinance entitled "An ordinance to prevent further litigation concerning the Oakland waterfront," by which its attorneys were directed to discontinue the said action as to all the defendants except the Oakland Water Front Company, and also "to file a stipulation in said action that the Oakland Water Front Company have a final judgment and decree quieting its title to the land described in its cross-complaint, but without damages or costs." Thereafter, February 7, 1882, there was filed in said action a stipulation signed by the respective attorneys as follows, viz: "It is hereby stipulated that this action be dismissed as to all the defendants except the Oakland Water Front Company, and it is further stipulated that the Oakland Water Front Company have a final judgment against plaintiff quieting its title to the land described in its cross-bill or complaint, without damages or costs," and on the same day a decree in said action was entered by the court in the following terms: "This cause coming on to be heard upon the cross-complaint of the defendant, the Oakland Water Front Company, and the stipulation of the parties on file herein consenting to this decree; now, therefore, it is ordered, adjudged, and decreed that said defendant, the Oakland Water Front Company, is the owner of the lands and premises herein"; and quieting its title thereto as against the plaintiff herein. The defendant has pleaded this judgment in bar of the plaintiff's right to maintain the present action.

A judgment rendered by consent becomes *res adjudicata* between the parties thereto, and, if the parties were competent to consent to such judgment, may be pleaded in bar of another action between them, with the same effect as if rendered after resistance and a litigation of the merits of the controversy. A judgment so rendered cannot, however, be treated as *res adjudicata* unless the parties thereto had the capacity to make the agreement which they have consented shall pass into judgment. The parties to a controversy may make an agreement with refer-

ence to their respective rights and obligations in any transaction as readily after an action has been brought for the judicial determination of those rights as without such action, and may have their agreement made a matter of judicial record, and such record of their agreement will have the same effect upon them as the record of a judgment given upon a trial by the court. In such a case, however, the record is not a judgment of the court upon a consideration of the merits of the controversy, but is only a judicial declaration that the parties have made such an agreement, and the court, in its judgment upon such consent, merely exercises a ministerial or administrative function in recording what has been agreed to between the parties.

In *Texas etc. Ry. Co. v. Southern Pac. Co.*, 137 U. S. 48, certain decrees, entered by consent of the parties, were invoked as a bar in another action between them, but the court said: "The decrees were entered by consent, and in accordance with the agreement, the court merely exercising an administrative function in recording what had been agreed to between the parties, and it was open to the supreme court of Louisiana to determine upon general principles of law that the validity of article VI was not in controversy or passed upon in the causes in which the decrees were rendered." The principle was stated by Lord Romilly in *Jenkins v. Robertson*, L. R. 1 Sc. & Div. App. Cas. 117: "*Res judicata* by its very words means a matter upon which the court has exercised its judicial mind, and has come to the conclusion that one side is right, and has pronounced a decision accordingly; but when an action of declarator is brought and a verdict is obtained by the pursuers, which is set aside, and an arrangement afterward takes place by which, in consideration of the payment of a sum of money, an interlocutor is pronounced for the defenders, and the court simply registers that interlocutor, without expressing any judicial opinion on the subject, I am of opinion that it is contrary to all principle to consider that such a transaction can be treated really as *res judicata*. . . . . In my opinion *res judicata* signifies that the court has, after argument and consideration, come to a decision on a contested matter; here the court exercised no judicial function upon the subject. It has merely exercised an administrative function by recording the interlocutor which had been agreed to between the parties." In *San*

*Francisco etc. v. Le Roy,* 138 U. S. 656, where an action had been brought by one Shaw against the city and county of San Francisco, in the state court, to quiet his title to certain pueblo lands, and the city had appeared by its attorney and filed a disclaimer and a consent to a judgment in favor of the plaintiff, the court said in reference thereto: "Whatever authority the attorney of the city and county may have had to conduct its ordinary litigation, he had none to relinquish rights reserved for the benefit of the public by the Van Ness ordinance." In *Kelley v. Milan,* 127 U. S. 139, in an action to enforce certain municipal bonds, the plaintiff relied upon a decree in chancery confirming their validity, which it was shown had been entered by consent of the parties upon an agreement to that effect signed by the mayor. Upon this it was said by the court: "This was no adjudication by the court of the validity of the bonds on the submission to it as a judicial tribunal of the question of such validity. The declaration of the validity of the bonds contained in the decree was made solely in pursuance of the consent to that effect contained in the agreement signed by the mayor of the town and the officer of the railroad company. The decree of the court was based solely upon the declaration of the mayor in the agreement that the bonds were valid. The adjudication in the decree cannot, under the circumstances, be set up as a judicial determination of the validity of the bonds. This was not the case of a submission to the court of a question for its decision on the merits, but it was a consent in advance to a particular decision by a person who had no right to bind the town by such a consent, because it gave life to invalid bonds, and the authorities of the town had no more power to do so than they had to issue the bonds originally." In *Lawrence Mfg. Co. v. Janesville etc. Mills,* 138 U. S. 552, the same principle was declared, the court saying: "The prior decree was the consequence of the consent, and not of the judgment of the court, and, this being so, the court had the right to decline to treat it as *res adjudicata.*" See, also, *Gay v. Parpart,* 106 U. S. 698, *Wadhams v. Gay,* 73 Ill. 415, *Branham v. San Jose,* 24 Cal. 604, where the court said: "It is obvious that the ayuntamiento, being merely the agents of the pueblo, acting under defined and expressly limited powers, could not bind the property held in trust by them for community purposes by any act not

strictly within those powers, either by way of contract or by the mere sufferance of judicial proceedings."

Under the foregoing authorities it is manifest that the judgment relied on is not available to the defendant as a muniment of title to the lands in question, or as an estoppel against the plaintiff in the assertion of its claim to the said lands. The plaintiff's consent to the judgment gave to the defendant no greater right than would its simple grant of the lands, for the reason that by reason of the trust under which they were held it was precluded from making such disposition, as we have above seen, either by a direct grant or by consenting to a judicial decision.

4. No greater effect is to be attributed to the several confirmatory ordinances subsequently adopted by the town of Oakland, or by the city of Oakland, than was created by the original ordinance. The same inability or infirmity in the town to transfer the land, or to make the grant, by the original ordinance, was inherent at the time of the adoption of the confirmatory ordinances, and continued in its successor, the plaintiff herein, and equally precluded any confirmatory ordinance which might be adopted from having a greater effect than did the ordinance which was originally adopted. The ordinances adopted by the city April 1 and April 2, 1868, by which it purported to release and abandon to Carpentier and his assigns all its claims in and to the franchises and property described in the former ordinances, were equally without the power of the city, so far as it was attempted thereby to part with its right to said land, or to confirm the preceding ordinances. The condition of the release named in the first of said ordinances, and which in the second is recited to have been performed, was the transfer of the land and franchises by Carpentier to the defendant herein, but, as such transfer was in pursuance of an agreement therefor previously entered into between them, to become effective upon the adoption of said ordinance, and, as the plaintiff herein was neither a party to such agreement, nor received any consideration or benefit by reason of the agreement or its subsequent execution, there was no equity created thereby in favor of the defendant and against the plaintiff, by which the plaintiff is precluded from asserting its want of power to adopt the ordinance.

The act of the legislature of March 31, 1868 (Stats. 1868, p. 222), under which the city council purported to adopt the said ordinances, cannot be construed as giving to the city a power to alienate property by way of compromise which had never been within its power to alienate, and whose alienation it was without the power of the legislature to authorize.

It is unnecessary to show that the rights of the city to the land could not be divested by a sale under execution upon a judgment recovered against it. Whatever liabilities the city might incur, as well as whatever obligations might be held against it, could be discharged only from its own property, and not from that which it held in trust for the public. As the land was public property, and held in trust by the city for the public, no right thereto could be created by virtue of any assessment or payment for taxes levied thereon.

5. The court found that certain parcels of land within the tract described in the complaint "have been filled in with earth, whereby said pieces have been raised above the level of ordinary high tide," and "that by reason of said several pieces of land being filled in and reclaimed from the tide, as appearing in these findings, plaintiff has lost, and the defendant has acquired, the title to each of said pieces so filled, and is the proprietary owner in fee of the same." These parcels are particularly described in the findings, and are excepted from the tract of land of which the plaintiff is adjudged to be the owner, and the defendant's title to said parcels is adjudged to be good and valid. The court also found that the defendant had the right to occupy and use, in a manner not inconsistent with the ordinary uses and purposes of navigation and commerce, two wharves described in the judgment which had been constructed upon the land of which the title was found to be in the plaintiff, until compensation be made to it for their value; and also found that the plaintiff is not the owner of that part of the lands described in the complaint which lies southerly from the present southerly boundary line of the city of Oakland. In accordance with these findings judgment was therefore rendered against the prayer of the plaintiff. From these portions of the judgment the plaintiff has appealed.

The parcels of the lands described in the complaint which have been raised above the level of ordinary high tide by filling

in with earth have thereby ceased to be capable of common use by the public for the purposes of commerce and navigation, and have therefore ceased to be subject to the trust under which navigable waters and the lands covered thereby are held by the state, and consequently the plaintiff, as the agent of the state in the discharge of that trust, has no further interest in the lands so reclaimed, or function to perform in reference thereto. If the lands have ceased to be held by the state in its sovereign capacity under the above trust, individuals may acquire the title of the state thereto by the same means as they may the title to any other lands held by the state merely in its proprietary right.

The wharves for which the plaintiff is, by the judgment, required to make compensation before the defendant shall be required to surrender possession, were constructed many years before the commencement of this action and while the defendant or its predecessor was in the possession of the lands under the ostensible grant of the plaintiff's predecessor. These wharves are instruments for carrying out the purposes of the trust under which the lands were held by the state, and their construction was within the purpose for which the state placed the lands under the control of the plaintiff. As they were constructed by the ostensible permission of the plaintiff or its predecessors, it would be inequitable for the plaintiff, having stood by and suffered their construction without making any objection thereto, to deprive the defendant thereof without making it compensation therefor.

In the act of 1852 incorporating the town of Oakland, its boundaries extended to the southerly line of the San Antonio creek; "thence down the southerly line of said creek or slough to its mouth in the bay; thence to ship channel." The act of 1854 incorporating the city of Oakland provided that "the boundaries of said city shall be the same as the boundaries of the present town of Oakland," and by section 12 of the act it succeeded to all the legal and equitable rights of the town of Oakland. The act of 1862 reincorporating the city declared: "The boundaries of said city shall be the same as are the boundaries of the late town of Oakland, which are more particularly defined and described as follows, to wit: "To the easterly or southeasterly line of that branch of the San Antonio slough, or estuary, over

which crosses the bridge from Oakland to Clinton; thence along the eastern and southern highest tide line of said slough and of the estuary of San Antonio, following all the meanderings thereof to the mouth of said estuary in the bay of San Francisco; thence southwesterly to ship channel." In the charter adopted by the citizens of Oakland, and approved by the legislature in 1889, the boundaries of the city, after reaching the intersection of Park avenue with the Encinal line of the town of Alameda, is "thence westerly following the center of the slough and the center of the estuary of San Antonio to ship channel in the bay of San Francisco."

As the plaintiff's claim to the lands in question is only by virtue of being a public corporation and governmental agency of the state, its right to the control of any of said lands must be limited to those of which it is the governmental agent of the state. The plaintiff's claim to the lands as successor to the town of Oakland must be limited to such as the state released to the town by the act of 1852, since that is the only statute by which the state has delegated the control of these lands. Although the boundaries of the city of Oakland were extended by the act of 1862, the state did not confer upon the city the control of the tide lands other than had been conferred by the act of 1852. The state had at all times the right to change the boundaries of the municipality, and whenever such change was made it ceased to be the governmental agent of the state for the management and control of the state's interest in any lands outside of its charter limits. It was not necessary that the state should expressly repeal or revoke the right or power of control originally given by it to the town of Oakland. The exclusion of any portion of the lands from the territory of the plaintiff would remove its control thereof as effectually as would a direct repeal of the power given in the act by which their management was originally intrusted to it; and the change in the boundaries of the city adopted by the citizens in 1889 was as effective for this purpose as if made by the legislature itself. It follows that, as the plaintiff's claim is limited to lands within its charter limits, the court was not authorized to enter a judgment in the present action affecting the title to lands outside of those limits.

It is proper to observe that the city of Oakland and the Oakland Water Front Company are the only parties to this action, and that the judgment herein is determinative of the rights of only these parties. Whatever rights to the land described in the complaint, or to any part thereof, the people of the state or any other person may have will not be affected hereby. Neither are we called upon to determine the boundaries of the land granted to the town of Oakland by the act of May 4, 1852, or to determine the location of the line of "ship channel," or the meaning of the term. There is no issue presented in the pleadings, nor was there any controversy at the trial, upon the location of "ship channel," and the court did not, either in its findings or in its judgment, assume to fix its location, but merely determined that the title of the plaintiff extended "to ship channel in the bay of San Francisco; thence northwardly and westwardly along ship channel to its intersection with the projection northwestwardly of the northern boundary of the city of Oakland." The plaintiff seeks to quiet its title to all the land described in the legislative grant to the town of Oakland by the act of May 4, 1852, viz: "The lands lying between high tide and ship channel," and bases its title solely upon that grant, while the title to the land which is claimed by the defendant is derived under the same legislative grant, through the conveyance to Carpentier. Whatever may be the proper location of that line, it is equally the limit of the claim by each of the parties hereto. The location of "ship channel" is therefore not only immaterial under the views expressed in the foregoing opinion, but as it was not an issue between the parties it did not require determination by the superior court, and does not call for an examination by this court.

The judgment and order denying a new trial should be affirmed.

Henshaw, J., concurred in the foregoing opinion of Mr. Justice Harrison.

Rehearing denied.